(No. 24574.—

JOHN E. SMUK, Appellee, *vs.* STEPHEN K. HRYNIEWIECKI, Appellant.

*Opinion filed October 13, 1938.*

Martin M. Gross, for appellant.

Thomas A. Hamilton, for appellee.

Mr. Justice Farthing delivered the opinion of the court:

Stephen K. Hryniewiecki (hereinafter called the appellant) has appealed from a decree of the superior court of Cook county which directed the cancelation of a contract for the sale of certain land to him by the appellee, John E. Smuk. The decree also dismissed, for want of equity, appellant's counter-claim for specific performance of the same contract.

Appellee alleges in his complaint that he is seized in fee simple of three lots, commonly known and described as 2406-08-10 W. Chicago avenue, Chicago. On February 13, 1932, he held first mortgage notes amounting to $16,600, and second mortgage gold bonds amounting to $6890, all

of which were secured by trust deeds on the lots in question. Appellant was then the owner of the equity of redemption. On that day, appellee notified appellant of his intention to foreclose the first trust deed and appellant thereupon requested an opportunity to repurchase the property. Appellee told appellant that if he would pay the second mortgage and give appellee a note for $16,000, plus interest and costs of foreclosure, secured by a trust deed which was to be a first mortgage on the lots, appellee would reconvey the real estate to him. It is alleged that appellant agreed to this proposition. On February 15, 1932, the parties entered into the following contract:

"This agreement entered this 15th day of February, 1932, between Dr. John E. Smuk, of the City of Chicago, State of Illinois, party of the first part, and Dr. Stephen K. Hryniewiecki, of the City of Chicago, State of Illinois, party of the second part, WITNESSETH, that WHEREAS, the party of the first part in consideration of $6890 evidenced and secured by the judgment note bearing interest at 6% per annum fully executed and delivered by the party of the second part to the party of the first part, will cause to be conveyed to the party of the second part after the foreclosure of Trust Deed recorded in the Recorder's Office of Cook County, in the State of Illinois, as Document No. 8956489, the premises situated in the County of Cook and the State of Illinois, described as follows, to-wit: [Lots 45, 46 and 47 in Read's Subdivision, etc.]

"WHEREAS, the Parties agree that the party of the first part will cause to be conveyed to the party of the second part the aforementioned described premises on condition that any legal owner and holder or owners and holders of certain bonds secured by Trust Deed recorded in the Recorder's Office of Cook County, in the State of Illinois, as Document No. 9015352, or any other party or parties having legal right or interest in the aforementioned described premises, will fail to exercise their right to redemption in and during the period of redemption, being the period of redemption prescribed by law.

"It is further agreed between the parties that upon failure to pay by the party of the second part, its aforementioned judgment note, the full amount or any part thereof recovered under the said judgment by the party of the first part, shall be considered as liquidated damages and this agreement shall at once become null and void at the option of the party of the first part.

"It is further agreed that this agreement shall be binding upon and inure to the heirs, executors, administrators and assigns of both parties."

Upon the execution of the written agreement appellant gave appellee a demand judgment note for $6890. Appellee alleged that the written agreement made no mention of the note for $16,000, with interest, nor of the payment of the expenses of the foreclosure suit about to be incurred. He further alleged that the agreement was made without consideration. He then alleged the prosecution of the foreclosure suit and the obtaining by him of a master's deed which was duly recorded on April 12, 1934. On May 10, 1934, appellant recorded the written agreement. The prayer of the complaint was that the purported contract of February 15, 1932, be set aside and declared void as against appellee.

Appellant filed an answer and counter-claim. As finally amended, these assert that the writter agreement expresses the intention of the parties, and appellant asked for its specific enforcement. The answer set up that the consideration for the contract was an agreement on the part of appellant not to prosecute a cause of action against appellee for a libel resulting from the publication of a magazine called the *Yellow Jacket,* of which the appellee was alleged to be the publisher. Appellant also prayed that a deficiency judgment for $3292.50, obtained in the foreclosure suit, be vacated and set aside. Appellee filed an answer to the counter-claim and the cause was referred to a master in chancery who took the testimony, and in his report recommended that a decree be rendered in favor of appellee. Objections to his report were overruled and ordered to stand as exceptions. The chancellor overruled the exceptions and entered a decree canceling the contract and dismissing the counter-claim.

Appellee testified that he had a conversation with appellant on February 15, 1932, at the latter's office. No one

else was present. He told appellant he intended to fore-close his mortgage for $16,000, because of defaults in pay-ment of taxes and interest. He testified appellant told him to go ahead and foreclose, because he could do nothing to prevent such action. On February 12, 1932, appellant had asked appellee to do him the favor of permitting him to repurchase the property if times improved, and appellee agreed to sell him the property if he paid all expenses in connection with the foreclosure, all interest, taxes, and the second mortgage, and gave appellant a first mortgage for $16,000 on the premises. Appellee further testified that, on several occasions, he had made demand on appellant for payment of the note for $6890 given February 15, 1932. His attorney wrote appellant letters demanding payment. Appellee offered to return the note to appellant at the trial. On cross-examination, it was made to appear that appellee had been a physician and surgeon for nine years. He had lived in Chicago twenty years and spoke the Ukrainian lan-guage. He was shown defendant's exhibit number one, which was a copy of the magazine containing the libelous matter. He was reluctant to admit that he had ever read it, and said that he had never talked to appellant about it, because they were enemies. Later he said the articles were jokes. He admitted that the place of publication stated in the magazine was the same as his office address. He testi-fied that at his suggestion his attorney, Nahirniak, prepared the contract quoted above. He denied that anything was said about the libel suit when the contract was executed, or that any ill-feeling existed between them at that time.

Appellant testified that he had been a physician for twenty-eight years, and that most of his patients were Ukrainians. A patient brought him a copy of the *Yellow Jacket* in April, 1931. Appellee also brought him a copy later in the same month. Michael Melnykovich was pres-ent at the time. Appellee laughed and asked appellant what he thought about it, and said: "Say, doctor, maybe you

want to be my subscriber. This costs only $1.50 a year."
He added: "I will destroy animals like you. I will chase
you out from the Ukrainian colony. If you are a Pole, go
to the Poles." Appellant told him to retract the libel in the
next issue, and threatened to sue him for $150,000 damages.
Appellee then said: "Don't you know this is America?" He
reminded appellant that a President of the United States
had sued a Milwaukee newspaper and had obtained a ver-
dict for only $1.00, and said: "You are not the President.
What will you get, if anything?" He told appellant that,
after the second issue, he would be nobody among the
Ukrainians. In May, 1931, the second issue came out and
appellee asked appellant how he liked it. In June, 1931,
the third issue was published and a copy was brought to
appellant by one of his patients. About June 15, 1931, ap-
pellee brought in a poem and acknowledged that he had
wronged appellant. In January, 1932, appellee notified ap-
pellant that he had to foreclose his mortgage. Appellant
again threatened to sue him for libel. Appellee then offered
to cancel the second mortgage, if appellant would not bring
the libel suit. This offer was rejected. The next offer was
to accept a long-term mortgage for $16,000, and to cancel
all other claims against appellant. In the alternative ap-
pellee could pay $10,000, cash, to clear the title to the land.
This offer was likewise rejected. The next conversation
took place about February 2, 1932, in the presence of
Michael Melnykovich, who owned a cafe on the first floor
of the building occupied by appellant. Appellant demanded
that appellee give him the building free and clear of all
mortgages in settlement of the libel suit, and Melnykovich
suggested that appellee, who by this time had agreed to
take $6500 cash, take that amount as a first mortgage. The
contract was then drawn up by appellee's attorney and was
duly executed, along with the note above referred to. The
amount was increased to $6890 on account of the expense
of foreclosing the mortgage, and a balance due on a note

for $500 given previously by appellant to appellee. Appellant testified that appellee promised to give him sixty days to raise the money, if he should decide to demand cash after he obtained the master's deed. In March, 1932, appellant cleaned and repaired part of the premises at his own expense. In March, 1934, appellee and his lawyer demanded payment of the judgment note. Appellant reminded them of appellee's promise to give him sixty days if appellee was not able to take a first mortgage. Appellee's attorney said there was nothing in the contract about sixty days. Appellee asked his attorney to be a witness that appellant had no money. He then remarked that the time was up (meaning that the Statute of Limitations had run) and that appellant could no longer sue him for libel. Appellant made arrangements to borrow the money from other sources, and when he told appellee of this, he was reminded that he did not have the money when it was demanded, and was told that the contract was null and void. Appellant told appellee that he had not tendered a deed and had no right to demand the money from appellant. On April 23, 1934, appellee's attorney, Nahirniak, wrote a letter demanding payment of the note, and saying that unless it was paid, suit for collection would be begun, but at the same time he insisted that the purchase agreement had been null and void from the date when payment of the note had been first demanded. Appellant testified that he consulted two lawyers, Stephen Love and Bohdan Pelechowicz, about bringing the libel suit.

Michael Darcovich testified for appellant that he was the cartoonist hired by Dr. Smuk to edit the *Yellow Jacket*. He identified the cartoons from two of the issues as having been drawn by him. He worked under the direction of appellee and quit after the publication of two issues, because he had not been paid. Leo Bilansky, who had known appellee for about fourteen years, testified that he saw Dr. Smuk trying to sell a number of the magazines on different occasions, once at a church and once at a bar. He

bought the magazine from him, and recommended one Maryniw to be editor of it. Appellee told this witness he was owner of the magazine.

Alexander Shapoval, the editor of the *Ukrainian Newspaper*, testified that the *Yellow Jacket* was printed in the print shop of the Ukrainian American Siege Athletic Organization, the publisher of the *Ukrainian Newspaper*. Appellee agreed to pay the cost of printing it, but he failed to do so and the publication of the *Yellow Jacket* was suspended after its fourth issue. At Shapoval's insistence that the law required the correct address of the editor to be stated in the magazine, appellee directed that his own address be given.

Michael Melnykovich corroborated appellant's testimony as to the conversations he had with appellee. Other witnesses corroborated him as to his success in raising the money to pay the note given appellee shortly after demand was made. Stephen Love testified that he advised appellant, in January, 1932, after reading translations of the libelous matter, that he had a cause of action against appellee, and suggested that another attorney named Pelechowicz prepare the declaration. Pelechowicz was friendly to both parties in this case and did not want to file the libel suit. Love agreed to file the suit, but was told that it had been settled, after the declaration had been prepared. Pelechowicz testified and, in general, corroborated the testimony on behalf of appellant. Appellee had tried to get him to subscribe to the *Yellow Jacket,* and appellant had consulted him about bringing the libel suit. He had advised appellant that he was not in default on the purchase agreement, because of appellee's failure to tender a deed. He assisted appellant to raise the money to pay the note. He does not appear as an attorney of record in the present suit.

Romeo Nahirniak, who is not representing appellee of record in this case, but who was present at the hearing and who advised appellee throughout, testified for appellee. He

stated that the parties agreed that there should be a first mortgage of $16,000 in addition to the note for $6890. He claimed that he asked appellant to pay the note and give a mortgage for $16,000, but admitted writing the letter to appellant in which he demanded payment of the note, only. His testimony contradicts appellant in every respect, but his interest in the case, resulting from close participation in it on behalf of appellee, detracts from his credibility.

When Dr. Smuk was recalled he testified that the "Officers Club," with headquarters at his address, was the publisher of the *Yellow Jacket*. He admitted, on cross-examination, that this testimony was a surprise to his lawyers, with whom he had been in close consultation, and he further admitted that when he had been sued in the municipal court for supplies furnished him in printing the *Yellow Jacket*, he had sought to shift the responsibility for the bill to a Mr. Motluck, who was manager of the printing shop where the *Yellow Jacket* was printed. Appellee called three witnesses who corroborated his contention that the *Yellow Jacket* was published by the "Officers Club." However, this defense does not seem to have originated until about a month before the trial of this case in 1935, although appellee had known that he was being charged with libel as early as 1931. While these witnesses claimed to be members of the club and responsible for the publication of the *Yellow Jacket*, they knew little about what it contained or its business affairs.

The witness Pelechowicz testified that he was present in the municipal court when appellee was sued for supplies furnished him in printing the *Yellow Jacket*. He heard appellee testify that a man by the name of Motluck was the owner of the publication. A judgment for $25 was there entered against Dr. Smuk. Pelechowicz testified further that on October 10, 1935, shortly before the trial of this case, appellee came to his office and inquired what he was going to testify about. The witness told him, and appellee

suggested that he find some means of keeping away from the witness stand.

Appellant contends that the contract of February 15, 1932, is the culmination of a series of negotiations between the parties thereto, and that, in consideration of his forbearance to sue for libel, appellee agreed to reconvey to appellant the land here involved for $6890, if no redemption were made from the foreclosure and the appellee obtained a master's deed.

Appellee contends, in support of the decree, that the purported written contract was not the complete agreement between the parties. He says that a provision for a first mortgage of $16,000 was omitted from the written agreement by mistake. He further contends that there was no consideration for the agreement, since appellant was indebted to him for $22,689, or much more than appellant agreed to pay for the premises.

Appellee's suit is not one charging fraudulent misrepresentations, but is an action to cancel a contract entered into under a mistake of fact by one of the parties. A court of equity may grant cancelation where the party requesting it has entered into the contract, without negligence, through a material mistake of fact, when it can do so without injustice to the other party. (*Steinmeyer* v. *Schroeppel*, 226 Ill. 9.) The fact concerning which the mistake was made must be material to the transaction and affect its substance, and must not result from the want of such care and diligence as would be exercised by persons of reasonable prudence under the same circumstances, and to warrant cancelation the evidence must be clear and positive. (*Winkelman* v. *Erwin*, 333 Ill. 636, 639, 640, and cases there cited.) More proof is required to justify cancelation, which has the effect of nullifying a contract solemnly entered into, than is necessary to justify refusing specific performance. (*Espert* v. *Wilson*, 190 Ill. 629, 636; 22 Am. & Eng. Ency. of Law, 1077.) There is a presumption that appellee exe-

cuted the contract voluntarily and with full knowledge of its contents. (*Klee* v. *Chicago Trust Co.* 365 Ill. 354, 356.) A contract entered into by mistake may be ratified thereafter, so as to make it binding upon the parties, the same as if it was fully understood at the time it was executed. *Anderson* v. *Anderson*, 251 Ill. 415, 420; *Phelps* v. *Pratt*, 225 id. 85.

Where the master's findings have been approved by the chancellor we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. (*Pasedach* v. *Auw*, 364 Ill. 491.) But an examination of this record convinces us that such is the case. Appellee does not, in his testimony, attempt to explain how the mistake occurred. The contract was prepared by his own attorney at his direction, and so it could not be the fault of the appellant that the provision for a $16,000 mortgage was omitted. It appears that the mistake, if any were made, was the fault of the appellee. No explanation of the delay in discovering the mistake was given. Furthermore, there is evidence tending to show that the agreement was ratified by the appellee. He demanded payment of the note almost two years after it was given, and in the letter written by his attorney threatened to begin suit to collect it, instead of tendering it back because a provision of the contract had been omitted by mistake. Appellee's efforts were directed rather toward putting appellant in default under the contract as it existed than to rescinding it. He demanded immediate payment of the note, and when this was not forthcoming, he declared the contract null and void. Apparently he sought the benefits of the contract until the present suit was brought and until the Statute of Limitations on libel had run. On the question of consideration, there can be no doubt, from this record, that appellee had libelled appellant, and entered into the present agreement in order to avoid being sued for damages. The testimony of appellee that he was not the publisher of the *Yellow Jacket* is not

convincing. He obviously was seeking to persecute appellant and destroy his medical practice. He started boldly at first, and then in June, 1931, after repeated threats of being sued for libel, became repentant, and gave appellant a poem in which he described himself as a sinner. When he was sued for supplies furnished in the printing of the *Yellow Jacket,* he claimed that Motluck was the publisher of the paper. When he sought to avoid the contract here in issue, he asserted that the "Officers Club" was the publisher. These claims are inconsistent. The testimony of Love, the attorney who was consulted about filing the libel suit, also adds force to the appellant's theory of this case. It shows that appellant was thinking of suing appellee for libel back in 1932, and that the suit was settled before it was filed. The testimony of Pelechowicz corroborated appellant in many respects, and seems far more credible and logical than the testimony of appellee's lawyer, who was an active participant in the trial, although not of record. In order to justify granting appellee the relief prayed, it is necessary to hold that appellant's closely knit and logical testimony and disinterested witnesses should be disregarded in favor of the appellee, who relies for corroboration mostly upon his lawyer who assisted in trying the case. The chancellor erred in overruling exceptions to the master's report.

Appellant has asked that the deficiency judgment rendered in the foreclosure suit be vacated and set aside, and, although we do not perceive just how this result could be accomplished in this collateral proceeding, it is clear that these parties never intended that the appellant should pay more than $6890 named in the promissory note given by appellant to appellee. In consideration of the payment of this sum, and the forbearance to sue appellee for libel, appellee was to convey the premises to appellant after appellee had obtained a master's deed thereto. However, appellant is not without a remedy. The prayer of his counterclaim is for general relief, and under it he is entitled to an

order permanently restraining appellee, and all those who claim under him, from enforcing the deficiency judgment above mentioned.

For the reasons indicated, the decree of the superior court of Cook county is reversed and the cause is remanded, with directions to render a decree for specific performance in accordance with the prayer of the appellant's answer and counter-claim, and to grant additional relief to appellant in accordance with the views herein expressed, including an accounting for rents and the dismissal of appellee's complaint for want of equity.

*Reversed and remanded, with directions.*