Gilbert F. Wagner, Appellee, v. W. G. Maguire et al., Appellants.
Appeal of William G. Maguire and W. G. Maguire and and Company, Inc.

Gen. No. 39,791.

Heard in the third division of this court for the first district at the October term, 1937. Opinion filed October 26, 1938.

JOSEPH A. STRUETT and THOMAS DODD HEALY, both of Chicago, for appellants; ROBERT J. BURDETT, of Chicago, of counsel.

LEO WAXMAN, GEORGE F. CALLAGHAN, MAURICE L. DAVIS, JOHN L. MCINERNEY and GEORGE E. LEVINGS, all

of Chicago, for appellees; GEORGE L. SIEGEL and GEORGE E. LEVINGS, of Chicago, of counsel.

MR. PRESIDING JUSTICE HALL delivered the opinion of the court.

By his bill of complaint, plaintiff charges that about February 2, 1931, Frank P. Parish and Peter B. Nelson, as trustees for W. G. Maguire & Co., Inc., among other securities, deposited in a safety deposit box in the Bank of Montreal in Toronto, Canada, 40,000 shares of the capital stock of the Missouri-Kansas Pipe Line Company, referred to in the record as "Mokan"; that under the terms of a written agreement dated March 14, 1934, entered into between Frank P. Parish, William G. Maguire and W. G. Maguire & Co., Inc., Parish thereafter acquired a one-third interest in and to the shares of stock mentioned; that thereafter Parish assigned to Gilbert F. Wagner, an attorney at law and plaintiff herein, 6,000 of such shares for services rendered by him to Parish, and that Parish also assigned the balance of the stock so acquired by him, amounting to 7,333 shares, to Monroe Percy Bloch, another lawyer, one of the defendants here, who had represented Parish in certain matters hereinafter mentioned. It is also alleged that about April 10, 1934, Parish, by written notice, resigned as trustee under the agreement between himself and W. G. Maguire & Co., Inc., and by the terms of this agreement, appointed and designated George F. Mara as trustee in his place and stead, and that Nelson and Mara were, at the time of the filing of the bill, the sole trustees under such trust arrangement. Plaintiff prayed for the appointment of a receiver of the trust estate, consisting of the shares of "Mokan" stock covered by his contract, and for an adjudication and distribution of this stock to the persons decreed to be entitled thereto. He also prayed for an allowance to him of his costs and reasonable attorney's fees.

Monroe Percy Bloch, by answer and cross complaint, alleged that he was entitled to 6,000 shares of this stock, together with any remaining balance of such shares to which Parish was entitled under the terms of the agreement between the parties entered into on March 14, 1934, after the delivery of the 6,000 shares claimed by the plaintiff. Parish, who was made a defendant in the bill, admitted all of the claims of the plaintiff, and stated that he had no interest in the property or the litigation, except in seeing to it that the agreement referred to, entered into between himself, William G. Maguire and W. G. Maguire & Co., Inc., on March 14, 1934, be carried out.

By answers and cross complaint, W. G. Maguire & Co., Inc., and William G. Maguire contend that the contract in question is void for want of adequate consideration; that all of the securities contained in the safety deposit box were always their property, and that other properties were turned over to Parish and Nelson, as trustees, which included Liberty bonds of the value of $220,000, together with 50,000 shares of certain stocks, for which these trustees have failed and refused to account. These two defendants further contend that Parish received these securities under the agreement mentioned, in trust for the benefit of W. G. Maguire & Co., Inc., and that Parish had no personal interest therein; that Parish had failed and refused to comply with the terms of the agreement of March 14, 1934, in that he failed to co-operate in opposing certain claims and adverse interests contrary to the provision of the contract, and that Parish had no right to convey any interest in the stock to the plaintiff or to Monroe Percy Bloch. These defendants also insist that the contract upon which plaintiff sues, is void as against public policy, and that it is invalid for want of consideration.

Phillips B. Preston filed a cross-bill in which he alleged that on June 27, 1934, William G. Maguire and

W. G. Maguire & Co., Inc., had entered into an oral agreement with him, wherein and whereby they were to divide evenly between these parties all of the securities which had been converted by and substantially recovered from Parish.

The agreement of March 14, 1934, referred to in the complaint, is as follows:

"Agreement made between Frank P. Parish and William G. Maguire and W. G. Maguire & Co. Inc.

"Mr. Parish is to deliver to Mr. Monroe Percy Bloch, his attorney and George F. Mara, jointly, all of the Kentucky Natural Gas bonds, the subject of the action hereinafter described in number 360 more or less together with all notes of the Missouri Kansas Pipe Line Company for which these bonds are collateral for the following purposes:

"Mr. Bloch and Messrs. Mara and/or Minton are to negotiate a loan, if possible, on pledge of the aforesaid securities and from the proceeds of this loan they are to pay two-thirds thereof to W. G. Maguire & Co. Inc. forthwith, and two-fifths of the remaining one-third of the said proceeds to Frank P. Parish forthwith. The remaining three-fifths of the said one-third of the said proceeds are to be retained by Monroe Percy Bloch and George F. Mara jointly, of which two of the said fifths shall be paid to Frank P. Parish within 45 days of the date hereof and the remaining one-fifth within one hundred days from the date hereof.

"It Is Agreed that Frank P. Parish and William G. Maguire and/or W. G. Maguire & Co. Inc., will make every effort to obtain physical possession of the 40,000 or 50,000 shares of the Missouri Kansas Company stock especially those remaining in the safe deposit box in Canada, and deliver them to Monroe Percy Bloch, John McKim Minton, Jr., and George F. Mara, who are in turn to divide them on the basis of two shares for Maguire and one share for Parish.

"William G. Maquire and Frank P. Parish agree to cooperate in opposing Hillman in furtherance of his proposed deal with respect to Missouri Kansas and Panhandle Eastern, Kentucky Natural and Columbia Gas & Electric relations in the interest of the stockholders of the Missouri Kansas Pipe Line Company.

"It Is Further Understood that at the expiration of the said one hundred day period subject to the payment of the loan if the notes and bonds are still unsold or uncollected they shall be divided on the basis of two-thirds to W. G. Maguire & Co. Inc. and one-third to Frank P. Parish.

"During one hundred days from the date hereof these notes and the Kentucky bonds shall not be sold nor surrendered to any person or institution except for the loan as aforesaid, subject to qualification by the joint consent of Parish and Maguire.

"Upon delivery of the bonds and notes as aforesaid the case of W. G. Maguire & Co. Inc., against Larchmont Company, *et al.,* shall be discontinued and the parties thereto and hereto shall exchange general releases, the ones with the other.

"Dated, New York, March 14th, 1934.

"Witness:

"Simon Klein          Frank P. Parish

"Simon Klein          William G. Maguire

                      W. G. Maguire & Co. Inc.

"Simon Klein          By: W. G. Maguire, Prst."

On the issues made, the cause was referred to a master in chancery to take proofs and report his findings. After hearing a large amount of testimony, the master made a report, together with his findings, and, as stated, recommended that a decree be entered in favor of the plaintiff and Bloch. Exceptions and objections to the report and findings were made, and after a full hearing, the court approved the findings of the master, and in addition, made a finding of the

facts, upon which report and findings the court entered its decree.

In the decree the court found that Wagner, complainant, is entitled to 6,000 shares of the Missouri-Kansas Pipe Line stock referred to, that Bloch is entitled to 7,333 of such shares, both as the absolute owners thereof, and that W. G. Maguire & Co., Inc., is entitled to receive the remainder of such shares. The court also ordered the payment by defendants of attorneys' and other fees amounting to $1,800, and the sum of $380.38 to be paid to plaintiff Wagner, as found by the master, on account of advancements and disbursements made by him. The court also found that the costs of the proceeding, including the master's fees and the cost of administration of a receiver of the stock in dispute, appointed *pendente lite,* should be borne by the defendants, William G. Maguire and W. G. Maguire & Co., Inc. This is an appeal by William G. Maguire and W. G. Maguire & Co., Inc., from the decree referred to. The question to be determined is whether or not the court was in error in awarding the shares of stock to Wagner and Bloch. It is admitted that Parish assigned to Wagner and Bloch all his interest in this stock.

At the time the agreement of March 14, 1934, was entered into between Parish, W. G. Maguire & Co., and William G. Maguire, there was pending in the Supreme Court of New York, a suit by the Maguires against Parish, referred to in the record as the ''Larchmont suit,'' for the recovery of $180,000 of the Liberty bonds mentioned, which, it was claimed, had been delivered by the Maguires to Parish in New York in the month of June, 1931, by the terms of which agreement Parish was to lend the proceeds of the bonds to ''Mokan,'' and for which he was to receive notes of ''Mokan'' to be secured by Kentucky Natural Gas Company bonds. Parish had insisted that he was not

required to make an accounting, claiming that the bonds had been delivered to him to pay certain obligations of W. G. Maguire & Co., Inc., and that if he, Parish, deemed it wise, he might use the balance in the interest of "Mokan" on behalf of Maguire & Company, and that he had made certain expenditures in compliance with this agreement. There was also pending a suit in attachment brought by the Maguires, the Larchmont Company and others, in which the Maguires alleged a conversion by Parish of 45,000 shares of the "Mokan" stock valued at $495,000, and the conversion of Liberty bonds in the amount of $270,000. Parish, on his part, insisted that the Maguires owed him money. Also, Parish claimed that the Maguires had damaged him by publishing libelous matter concerning him.

After the contract referred to and on March 14, 1934, all the matters between Parish and the Maguires were apparently settled, a statement to this effect was delivered to Parish, and a large amount of bonds and stocks were delivered to the attorneys for the Maguires. In fact, the record clearly indicates that prior to the beginning of the suit, apparently, every controversy then existing between the Maguires and Parish, had been settled to the evident advantage of the Maguires, except the delivery of the $40,000 of stock to Parish. Pending this proceeding, this stock was turned over to a receiver, appointed by the court.

The essential facts, as disclosed by the evidence, and as found by the court, are, in substance, as follows:

Parish had been the president of the corporation referred to as "Mokan." Through another corporation, a pipe line was built from the southwest to the Illinois-Indiana line, the purpose of which was to bring natural gas from what is known as the Panhandle of Texas to the central west. In 1930 certain

eastern interests made a raid on the market, which caused a drop in the price of the common stock of "Mokan," and as a result "Mokan" was in financial difficulties. William G. Maguire was then employed in an endeavor to raise money for this corporation. Through an agreement made by Maguire & Co., a large amount of money was secured through the National City Company of New York. As commission for this work, Maguire & Co. was given one million dollars in cash and $125,000 in shares of "Mokan" stock by the "Mokan" corporation, and they were also given $450,000 in cash and 10,000 shares of common stock of "Mokan" by the National City Company. After the commission had been paid to Maguire & Co. in the year 1931, Maguire & Co. purchased Liberty bonds, and gave $700,000 of these bonds and 106,000 shares of "Mokan" stock to Parish and Peter B. Nelson, Maguire's attorney, with instructions that these two were to go to Canada and deposit the Liberty bonds and the stock in a safety deposit vault. It is insisted, and apparently not questioned, that Parish and Nelson thereby became trustees of these properties with Maguire and Maguire & Company as the beneficiaries. Nelson and Parish went to Toronto, Canada, and rented a vault, but Parish retained $220,000 of the Liberty bonds and 66,000 shares of the common stock of "Mokan." The remainder of the stock, being 40,000 shares of common stock of "Mokan" and the remainder of the Liberty bonds amounting to $480,000 were then placed in the safety deposit box in Toronto, Canada. In May, 1931 with the authorization of Maguire, $300,000 of Liberty bonds were taken out of the box in Canada. Of that sum, $250,000 of the bonds were delivered to Maguire & Co. and $50,000 were used by Parish to pay certain persons named by Maguire. In July, 1931, Parish again went to the box in Toronto and took out $180,000 in Liberty bonds, which act was also authorized by

Maguire & Co. The $180,000 in Liberty bonds were used by Maguire & Co. for the purpose of making a loan to ''Mokan,'' and ''Mokan'' gave Maguire & Co. a note for $180,000 and secured the same by bonds of the Kentucky Natural Gas Company in double that amount, or $360,000. The ''Mokan'' note in the amount of $180,000 and the bonds of the Kentucky Natural Gas Company in the sum of $300,000 came into the possession of Parish without the authority of Maguire & Co. There was left in the box at Toronto the 40,000 shares of common stock of ''Mokan'' in controversy. Thereafter, Maguire ascertained that Parish had invested some of the $220,000 in Liberty bonds that he took out on February 1, 1931, and had purchased a yacht. Parish was thereafter indicted in Chicago by the federal grand-jury. Maguire & Co. commenced the two actions in New York city for the purpose of recovering the securities mentioned, and those actions were pending on March 14, 1934. One of the actions, the Larchmont case, already referred to, was to go to trial on March 15, 1934. On March 14, 1934, both Maguire and Parish were in the office of Monroe Percy Bloch in New York city in connection with a proceeding relating to the taking of testimony in this case which was to go to trial. Bloch represented Parish. While the parties were in this office, a discussion arose, which finally resulted in the drafting of the agreement dated March 14, 1934, between Frank Parish and William G. Maguire and W. G. Maguire & Company. In their answers filed here, Maguire and Maguire & Company acknowledge the drafting and execution of the agreement. They insist, however, that at the time the agreement was drawn there was another, oral, agreement between the parties, the effect of which was to make Frank Parish a trustee for Maguire and Maguire & Company, and that it was his duty to Maguire and Maguire & Company under the oral agreement and the

written agreement combined, to use the securities and the proceeds of securities as a trustee, and to account faithfully to Maguire and Maguire & Company. There is nothing in the record to indicate such an agreement. At the time of the argument on the exceptions to the master's report, leave was given to Maguire and Maguire & Company to file an amendment to their cross complaint, which amendment set up various claims, among them that the agreement of March 14, 1934, was void because it was contrary to public policy and because there was no consideration. It is contended by Maguire and Maguire & Company that Parish was a trustee not only from February 1, 1931, until March 14, 1934, but that he was also a trustee from that time on. It will be assumed that during the period from February 1, 1931, to March 14, 1934, both Parish and Nelson were trustees and that the beneficiaries were Maguire and Maguire & Company. The question then arises as to why Maguire for himself and for his corporation entered into the written agreement of March 14, 1934, if he did not intend to carry it out. The record indicates that Maguire knew all about Parish, and was familiar with and accustomed to business transactions. As stated, the parties met in the office of Bloch in connection with the pretrial proceedings; there were certain attorneys present at that time, Mara and Minton representing Maguire, and Bloch representing Parish. Maguire testified that he knew Parish was under indictment, and that he knew Parish had taken Liberty bonds and stock that belonged to him. He testified that at that time he refused to talk to Parish. Later, when he was informed that he should look at a document relating to the opposition to a settlement of what was termed the Hillman claim, which Parish had drawn, Maguire declined to do so, but subsequently he looked at the document and thereafter the conversation continued. The

contract in question was then drawn, changes and interlineations were made in it, and then it was signed by Parish and William G. Maguire, individually and for the corporation. It is to be noted that one paragraph of the contract entered into between the parties on March 14, 1934, contains the following provision: "William G. Maguire and Frank P. Parish agree to cooperate in opposing Hillman in furtherance of his proposed deal with respect to Missouri Kansas and Panhandle Eastern, Kentucky Natural and Columbia Gas & Electric relations in the interest of the stockholders of the Missouri Kansas Pipe Line Company."

With regard to this provision, the master and the court found, as the evidence shows, in substance, that in 1930 the Panhandle Eastern Pipe Line Corporation, referred to in the record as "Panhandle," was incorporated under the laws of the State of Delaware, with Parish as its principal officer and director; that the capital stock of this corporation was owned by "Mokan," and that "Panhandle" was organized for the purpose of engaging in the distribution of natural gas; that the "Panhandle" commenced the erection of a pipe line for the distribution of natural gas from the State of Texas to the State of Indiana, as hereinbefore mentioned, and that in the month of June, 1930, competitors of "Panhandle" engaged in the business of furnishing natural gas to the eastern portion of the United States, and, as stated, raided the market of "Mokan" stock and otherwise interfered with the operations of "Panhandle"; that in the month of September, 1930, an agreement was entered into between "Mokan," the Columbia Oil and the National City Company, the latter being a New York bank, whereby the Columbia Oil agreed to purchase a one-half interest in the common stock of "Panhandle," and the National City Company undertook to underwrite the completion of the pipe line for the sum of $20,000,000; that in order to carry out the contract

entered into on September 17, 1930, above mentioned, between ''Mokan'' and the Columbia, and in order to raise $6,000,000, ''Mokan'' conveyed and assigned its entire interest in ''Panhandle'' to a new corporation, and that in order to procure this $6,000,000, ''Mokan'' issued $1,060,000 of ''Mokan'' notes secured by 90 per cent of the Panhandle Corporation stock, together with $1,060,000 of Kentucky Natural Gas first mortgage bonds, and $4,940,000 of ''Panhandle'' notes secured by $4,945,500 ''Panhandle'' eastern notes, and that all of these securities were pledged by ''Mokan'' to one J. H. Hillman of Pittsburgh, Pennsylvania, to secure the payment of $6,000,000. Thereafter, the affairs of ''Mokan'' became involved, and its business unprofitable, and disputes arose between ''Mokan,'' the Columbia Oil, Hillman and others concerning ''Panhandle.'' It was charged that Columbia Oil deliberately wrecked ''Mokan.'' During the month of March, 1932, the chancery court of Delaware appointed receivers for ''Mokan,'' and an ancillary receiver was appointed by the United States District Court for the Northern District of Illinois. In 1933 the obligations of ''Mokan'' to Hillman became due and payable, and a settlement was arranged between the ancillary receiver and Hillman, wherein and whereby Hillman was to become the absolute owner of 75 per cent of the stock of the Panhandle Corporation, which held one-half of the entire capital stock of Panhandle Eastern, and it appears that thereby Hillman and his associates would become the absolute owners of $1,060,000 of Kentucky Natural Gas Company bonds, which were to be exchanged for new stock of the reorganized Kentucky Natural Gas Company, and that as a result of this proposed settlement, the receivers of ''Mokan'' would be left with only a 25 per cent interest in the stock of the Panhandle Corporation. It was for the purpose of defeating the settlement just referred to, and in inducing the Chancery Court of the State of

Delaware to reject such settlement, that Parish employed the plaintiff Wagner.

Upon the question of the proposed settlement and the Maguires' interest therein, the court found from the evidence that:

"Maguire was a large stockholder in Mokan; he was naturally interested in having the Hillman settlement disapproved by the chancellor in Delaware in the hope that the stock would eventually become valuable. He knew that Parish was instrumental in organizing Mokan, that he knew all the details, that he was thoroughly familiar with the situation and he knew that he was able to combat the proposed settlement. At that time the settlement had been approved by the receivers appointed by the Delaware court and it was up before the chancellor for approval." The record indicates that largely through the efforts of Parish, together with Wagner and Bloch, his attorneys, the Delaware court rejected the proposed settlement, and as a direct result the Maguires' interest in "Mokan" was increased many times in value.

We have not heretofore reviewed a record in which the master and chancellor had made a more careful analysis of the evidence and a more satisfactory finding than each has done in this case. The court in its detailed finding, after carefully reviewing the evidence and the findings of the master, found and determined that every consideration and promise agreed to be given or performed by Parish had been fully met, and our conclusion is that the findings of each is correct. In *Pasedach v. Auw*, 364 Ill. 491, the Supreme Court said: "The master in chancery saw the witnesses and heard them testify. It was his province in the first instance to determine the facts. While his finding of facts does not carry the same weight as the verdict of a jury, nor of a chancellor where the witnesses have testified before him, yet the master's findings

are entitled to due weight on review of the cause. (*Keuper v. Mette,* 239 Ill. 586.) His conclusions as to the facts have been approved by the chancellor. In that situation we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. *North Side Sash and Door Co. v. Hecht,* 295 Ill. 515; *Klekamp v. Klekamp,* 275 id. 98." The claim that the contract is against public policy, has no merit.

The motion to dismiss the appeal and the plea of release of errors, are denied.

The decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

HEBEL and DENIS E. SULLIVAN, JJ., concur.