Irna Phillips, Appellant, v. W. G. N., Inc., and the Tribune Company, Appellees.

Gen. No. 41,091.

2

PACKARD, BARNES, McCAUGHEY, SCHUMACHER & GIL-
MORE, of Chicago, for appellant; GEORGE PACKARD and
ARTHUR J. JENNETT, of Chicago, of counsel.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of
Chicago, for appellees; HOWARD ELLIS, J. B. MAR-
TINEAU, KEITH MASTERS and WM. H. SYMMES, JR., all
of Chicago, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the
opinion of the court.

April 9, 1932, plaintiff filed her bill of complaint to
restrain defendants from broadcasting a serial radio
program known as "Painted Dreams" and for dam-
ages. After the issue was made up the cause was re-
ferred to a master in chancery who took the evidence,
made up his report and recommended that the suit be
dismissed for want of equity. Objections to the report
were overruled; they were afterward ordered to stand
as exceptions; the exceptions were overruled and a
decree entered in accordance with the recommenda-
tions of the master. Plaintiff appeals.

The record discloses that The Tribune Company,
and later its successor WGN Inc., owned and operated
a radio broadcasting station in Chicago; that plaintiff,
who lived in Chicago, had attended Northwestern Uni-
versity, the University of Wisconsin and the Univer-
sity of Illinois, where she was graduated in 1923; that
after her graduation she taught dramatics at a girls'
public school in Fulton, Missouri for two years; she
then taught the same subject in a public school at Day-
ton, Ohio, and about May, 1930, applied to defendants
for employment in the preparation and broadcasting
of radio programs. Her first work in broadcasting was

on Decoration Day, May 30, 1930. About July following, she did some other short jobs and in September was given further work to do in preparing daily script and taking part as the principal character in the broadcasting of it. This work continued until some time in September, 1931. Plaintiff was paid by defendants for the work. The broadcasting was daily except Sunday, the expense of which was borne by defendants in the hope that a sponsor might be induced to pay defendants for advertising its product in connection with the broadcasting. September 25, 1931, the Mickelberry Company entered into a contract with defendants for a period of six months to sponsor the program and at about the time the contract was entered into plaintiff, without notice or knowledge of defendants, filed the first ten scripts in the Copyright Division of the United States Patent Office claiming to be the author and owner. Plaintiff continued with her work until about April 2, 1932, when she was discharged, and afterward defendants continued to broadcast "Painted Dreams" the script being prepared by one of its employees and such broadcasts were given up to the time the decree was entered, July 14, 1939.

Plaintiff's position as stated by her counsel is that she "originated the set-up, characters and plot of this drama and never relinquished to anyone her author's rights; . . . " that she "is radio author and actress, and 'Painted Dreams' was her first venture in this kind of a daytime continuity production, which also was a novelty with the WGN station. She was contracted with to furnish the daily scripts for each performance and take part therein as an actress, assuming the rendition of two of the characters. Her position is that she is entitled to a common law author's right of protection for the products of her brain where those rights are infringed by the defendants who wrongfully excluded her from their studios after over a year's use of her product under license;" that defendants by con-

tinuing the broadcast after excluding plaintiff are deceiving the public, leading the public to believe the production was a genuine continuation of plaintiff's work and that by continuing the imitation "plaintiff can find no radio exchange or sponsor who will take this creation of hers under that name so long as WGN carries on in this manner" by reason of which she has suffered damages.

On the other side, counsel for defendants say the theory of the defense is "twofold, *first,* there was no unfair competition,—plaintiff's own evidence proves by the statements of 242 members of the radio audience that there was none. *Secondly,* all literary property is in defendant because it hired plaintiff at a salary of $25 a week to write, according to the plot outlined, setting and character formula it then gave her. She agreed to do so without making any claim of ownership;" that plaintiff wrote the script as ordered by defendants under their supervision and that she was paid for the work she did.

The record is voluminous—5,900 pages. The contract between the parties was oral and nothing was said about the ownership of literary production. The evidence bearing on the vital question is in sharp conflict, plaintiff's evidence tending to support her theory while defendants' evidence, if true, sustains their theory; so that a determination of the case turns on a question of fact. The master found the facts in favor of defendants, this was sustained by the chancellor, and in this situation, under the latest holding of the Supreme Court which we have found, we are not justified in disturbing the findings unless they are against the manifest weight of the evidence. *Pasedach v. Auw,* 364 Ill. 491; *Smuk v. Hryniewiecki,* 369 Ill. 546; *Metropolitan Life Ins. Co. v. Shattas,* 298 Ill. App. 336; *Zamis v. Hanson,* 302 Ill. App. 404; *Grant Hospital of Chicago v. Bierfield,* 306 Ill. App. 579 (Abst.) ; *Wagner v. Maguire,* 297 Ill. App. 48.

In the *Smuk* case, the court said: "Where the master's findings have been approved by the chancellor we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. (*Pasedach v. Auw,* 364 Ill. 491.)" There are other cases holding this is not a correct statement of the law; *Oliver v. Ross,* 289 Ill. 624; *Chechik v. Koletsky,* 311 Ill. 433; *Union Bank of Chicago v. Gallup,* 317 Ill. 184; *Mallinger v. Shapiro,* 329 Ill. 629, but whichever rule is applied in the instant case the result must be the same.

The evidence without dispute shows that prior to May, 1930, plaintiff was inexperienced in preparing script or doing anything in connection with broadcasting programs. Her talents in this respect were wholly undeveloped. In May, 1930, she wrote from Dayton, Ohio, to Mr. Gilman who was then connected with defendants applying for an opportunity to broadcast and afterward came to Chicago, saw Mr. Gilman, and as stated by her counsel in their brief: "He was impressed with her potential capability and gave her a chance to appear without pay from time to time on the amateur program called 'Everybody's Hour' and also perform other small odd jobs of broadcasting as the summer went on, for which she sometimes was paid a small recompense. On Decoration Day, 1930, he let her appear for a half hour with a variety composition she had gotten together, consisting of poems, etc., which was successful. She was not paid for this.

"Selinger was the station manager at that period. He had mentioned to Gilman sometime in July or August a plan he had for an experiment with a homely daytime serial involving an Irish mother, her daughter, and the daughter's friend. Gilman suggested to Selinger that the plaintiff might try her hand at it, and Selinger authorized him to take it up with her—which Gilman failed to do until early in October of that year."

The evidence further shows that during the summer' of 1930, plaintiff was given a small part in some evening broadcasts for which she was paid $10 for each performance. The first of these payments was July 5, 1930, and from that date until September 10, her name appeared on the supplementary payroll on three or four occasions as "Additional Talent." That during this period anything she wrote which was to be broadcast was submitted to defendants' representatives in charge of the station. About September Selinger employed plaintiff to prepare some scripts for broadcasting for which she was to be paid $25 per week. Plaintiff then wrote the first ten episodes of "Painted Dreams" which title was suggested by Selinger and she was paid for her work for four weeks. Afterward, "Painted Dreams" was broadcast as a daily program, as stated, plaintiff taking the principal and another part in the drama and was paid $50 a week. Later this' was increased to $75 and September 25, 1931, defendants secured the Mickelberry Company to sponsor the program for which it paid defendants. It was about this time when plaintiff learned of the Mickelberry contract that she told defendants she was the producer and reserved ownership in the script. The defendants at that time denied she was such owner but on the contrary stated that they told her the ownership was in defendants. Plaintiff's pay was raised to $100 per week and she continued with her work. "Painted Dreams" was continued as before until April 2 following when the Mickelberry contract expired and plaintiff was discharged.

Defendants' evidence is to the effect that Selinger talked to plaintiff who was seeking employment, gave his idea of the nature of a program and plaintiff was hired to write the program as he ordered her to do under his supervision, and that when she wrote the several episodes they were submitted for approval before being put on the air. The evidence further shows

that after April 2, 1932, plaintiff prepared script and broadcast it from another radio station—substantially the same serial or drama she had theretofore been broadcasting from defendants' station—which she designated "Today's Children" and the principal character taken by plaintiff was "Mother Moran" instead of "Mother Moynahan," who was a similar character in "Painted Dreams;" that for about four months plaintiff carried on this work over the other station at her own expense, at which time a sponsor was obtained and thereafter plaintiff received $500 per week, later $850 per week, $1,000 per week, $1,250 per week and finally $1,500 per week.

There is a great deal of other evidence in the record which we think unnecessary to mention here. But counsel for plaintiff say defendants prepared two written documents. The first is in the nature of a letter addressed to Mr. Isaac of WGN, signed by plaintiff, and the second was not signed by either party and that these contain admissions by defendants which tend to show they recognized plaintiff's ownership of the script, etc. The first document was written in longhand by George Isaac and addressed to him in which plaintiff offers her "complete services to WGN Inc. for a radio production now known as 'Painted Dreams' . . . This gives you guarantee of complete performance including all writing, artists, musicians . . . to be completely under WGN control and supervision;" that her services are available starting as of April 2, 1932, at $450 per week for six months and for an additional six months at $550 per week" etc., and continuing the letter states: "This gives you full right to use this feature on as many stations as you see fit" except that if there is a double broadcast plaintiff will receive 25 per cent more than the amounts mentioned, for compensation and "I will agree that during the period of these options WGN Inc. shall have the exclusive rights to any material, writings, effect or any

other thing used to produce this complete program. Sincerely, Irna Phillips.''

The other document, also prepared in the form of a letter, dated February —, 1932, was addressed to Miss Phillips but was not signed by a representative of the Tribune Company nor accepted by plaintiff. It states the Tribune engages plaintiff's services for a period of six months commencing April 2, 1932, and ending October 1, 1932: continuing, ''You assure us you are free from any obligations to others preventing you from entering into and fully carrying out the terms of this agreement.'' That the service plaintiff is to render is writing original dialogues, scripts and continuities for a radio feature known as ''Painted Dreams,'' giving such radio performances as ''we deem advisable.'' That plaintiff was to give performances of ''Painted Dreams'' as designated by defendants; that the writings were to be original and that defendants' ''full use of them will not conflict with any rights of others, and you agree to defend claims of infringement as to such writings and save us harmless from any damage we may suffer therefrom.'' That plaintiff was to give defendants the right to use her name, testimonials, statements and photographs in connection with advertising ''Painted Dreams;'' that she would not during a period of two months after leaving defendants' employ prepare, use or deliver to any other party any ''literary or artistic material'' containing any characters appearing in the material furnished to defendants; that plaintiff further agreed she would not ''during the term of this agreement and for a period of two (2) months after leaving our employment,'' appear in any broadcast, etc., in ''Painted Dreams'' for which services and the rights defendants agree to pay $125 a week but if the broadcast was over a chain or network, $175 a week, and that after the termination of the employment plaintiff would not

broadcast her work for any other station if the compensation offered by defendants was equal to or greater than any other offer she might receive, etc.

Counsel for plaintiff contend these two documents, having been prepared by a representative of defendants, after September, 1931, at which time defendants knew plaintiff was claiming property rights in the scripts and her performances over the radio, clearly show defendants recognized plaintiff's claim that she was the originator and owner of "Painted Dreams" and had the right to license its use. And counsel say the second document is "of supreme importance." We think the documents are to be considered in connection with all the other evidence but are of opinion many of the statements in them were merely precautionary. For instance, in the latter document, plaintiff agrees to defend claims of infringement and save defendants harmless from any damage, etc. There is no specific statement that acknowledged ownership in plaintiff nor any evidence that plaintiff made any suggestion that such a provision be inserted. Moreover, neither of the documents was executed by the parties.

The question of ownership of literary property, as between employer and employee, is to be determined by what was contemplated by the contract of employment. *Fisher v. Star Co.*, 231 N. Y. 414.

In the *Star* case suit was brought by Fisher, the creator of cartoons familiarly known as "Mutt and Jeff," to enjoin defendant from publishing cartoons for the reason that such publication would deceive the public into thinking they were the Fisher cartoons. Plaintiff had a contract that his cartoons might be published by another concern, plaintiff asserting that to permit defendant to publish the cartoons would be unfair competition. An injunction was awarded, the court holding that the action of defendant in publishing the cartoons was unfair competition. The court there

said: "A person who uses an unregistered name or mark can prevent others using the same so as to deceive the public into thinking that the business carried on by such persons and the goods sold by them are his. . . . Such conduct as is calculated to deceive the public into believing that the business of the wrongdoer is the business of him whose name, sign or mark is simulated or appropriated can be restrained in equity. . . .

"The controlling question in all cases where the equitable power of the courts is invoked is, whether the acts complained of are fair or unfair. The determination of this appeal depends first and primarily upon the facts. . . . The inquiry is, whether the use of the names 'Mutt' and 'Jeff' and the grotesque figures to which the names are applied by the appellant would be unfair to the respondent." In that case there was substantially no controversy that Fisher owned the cartoons which he created. On this question the court said: "It also appears from the findings of fact that the respondent is the owner of the property right existing in the characters represented in such figures and names. They are of his creation. They were published and became well known as distinct characters before the contract was made with the appellant. Property rights in literary and other property, the product of the brain as between employer and employee, are determined by what was contemplated by the contract of employment."

In the instant case, the substantial controversy is whether plaintiff was the originator or whether the plan was originated by Selinger and plaintiff wrote the script as ordered under his direction and supervision, and whether plaintiff was employed to write this script, take part in the broadcast and was paid for what she did. When plaintiff was employed by defendants she was practically wholly without experience in the

work she was to do. We think the great weight of the evidence is that plaintiff was employed by defendants to do particular work; that she did the work, was paid for it and in such a situation under the law the ownership in the result of what was done belonged to defendants. *Solomons v. United States,* 137 U. S. 342; *United States v. Dubilier Condenser Corp.,* 289 U. S. 178.

In the *Solomons* case the court said: "If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer." To the same effect is the *Dubilier* case where the court said: "One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. *Standard Parts Co. v. Peck,* 264 U. S. 52. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent."

The same rule is applicable to a literary or dramatic production. *Fisher v. Star Co.,* 231 N. Y. 414; 13 C. J. § 152; 18 C. J. S. § 57; *Bleistein v. Donaldson*

12

*Lithographing Co.,* 188 U. S. 239; *Brown v. Molle Co.,* 20 F. Supp. 135; *Yardley v. Houghton Mifflin Co., Inc.,* 25 F. Supp. 361.

The decree of the superior court of Cook county is affirmed.

*Decree affirmed.*