J. Meyers, Appellee, v. Mollie Dorfman et al.
Sam Nerenberg, Appellant, v. Mollie Dorfman et al.

Gen. No. 42,921.

Heard in the first

division of this court for the first district at the December term, 1943.
Opinion filed April 3, 1944.

ISRAEL DORDEK, of Chicago, for appellant.

DAVID M. JACOBSON, of Chicago, for appellee.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

December 2, 1940, J. Meyers filed his complaint in chancery to foreclose the lien of a trust deed given to secure an indebtedness of $11,000, evidenced by a mortgage note on which $8,250 principal and interest were due and unpaid. He made Mollie Dorfman, one of the mortgagors, and others including Sam Nerenberg, who it was alleged was the owner of a second mortgage on the premises, defendants. Nerenberg filed a cross-complaint in which he alleged that the indebtedness, secured by the trust deed, which Meyers sought to have foreclosed, was paid by the mortgagor, Mollie Dorfman while she held title to the property and therefore it ceased to be a lien on the premises. He prayed foreclosure and that he be given a first lien on the premises and that if Meyers was entitled to any claim or lien it should be decreed to be subordinate and inferior to the lien of his trust deed.

After the issues were made up the cause was referred to a master in chancery to take the evidence and make up his report with recommendations.

Prior to the commencement of the hearing before the master the deposition of plaintiff Meyers was taken January 31, 1941, before a notary public and the deposition of the defendant Mollie Dorfman was likewise taken before a notary public July 9, 1941. Each of these witnesses was called by the defendant and cross-complainant Sam Nerenberg as adverse witnesses. Their testimony was written up and, by agreement, was submitted to the master for his consideration in connection with the other evidence heard by him. The

master made up his report which was filed July 22, 1943, in which he found there was due plaintiff, Meyers, $13,283.67, for which he had a first lien on the premises. The master further found that the defendant and cross-complainant, Sam Nerenberg, had a valid lien on the premises for $6,565.09, which was subject and inferior to the lien of Meyers. Nerenberg appeals—Mollie Dorfman has not appeared in this court.

Nerenberg filed four objections to the master's report, three were sustained and the fourth overruled. The chancellor approved the master's report, a decree was entered in accordance with the findings and recommendations of the master, and Nerenberg appeals.

The record discloses that Mollie Dorfman and Sam Nerenberg are sister and brother; that September 23, 1929, Mollie Dorfman and her husband Joe, executed their trust deed conveying the property in suit to the West side Trust & Savings Bank, as trustee, to secure the payment of $7,000, which was a part of the purchase money. The indebtedness was payable in installments as evidenced by 47 notes executed by Mollie and her husband, the last of which was due August 23, 1933. They bore interest at 6 per cent per annum, payable monthly.

January 15, 1931, Mollie and her husband conveyed the premises by another trust deed to the West Side Trust & Savings Bank, to secure an indebtedness of $11,000, which was evidenced by their note of that date, due two years after date, with interest at 6 per cent per annum, payable semi-annually. January 30, 1931, Sam Nerenberg, the owner of the trust deed and notes, above mentioned, executed an agreement subordinating the lien of his trust deed to that of the trust deed given to secure the indebtedness of $11,000. The evidence further shows that 18 of the notes belonging to Sam Nerenberg, due monthly, aggregating

$2,700, were paid, leaving notes 19 to 47, due and unpaid, amounting to $4,300. That $500 was paid on the $11,000 indebtedness leaving a balance due of $10,500. The note for $11,000 and trust deed securing its payment, were owned by the West Side Trust & Savings Bank.

January 15, 1933, the time of payment of the $11,000 indebtedness which had been reduced to $10,500, was extended to January 15, 1936, and Mollie, her husband and her brother, Sam, executed an agreement extending the time of payment of $4,300, which was the balance on the $7,000 indebtedness, to August 17, 1941. The evidence further shows that January 25, 1939, the improvements on the premises were destroyed by fire and shortly thereafter, Mollie Dorfman, the owner of the premises, collected $16,250 from various insurance companies for the loss.

Counsel for plaintiff Meyers contends that the evidence shows that on December 30, 1935, "Etta Chitra, a friend of Mollie Dorfman, purchased the said first mortgage and note from the receiver of the West Side Trust & Savings Bank" for $8,250. That "Etta Chitra (Nerenberg's witness) used her own money and money borrowed from others to purchase this mortgage. When Etta Chitra wanted the return of the money, Mollie Dorfman pledged the first mortgage and note with another party, one Ethel Miller, as security for a loan. Upon the failure of Mollie Dorfman to pay Ethel Miller the said Ethel Miller sold the said first mortgage and note." That plaintiff, Meyers, bought it as a defaulted mortgage in a trade of various defaulted bonds and mortgages.

On the other side, counsel for Sam Nerenberg's position is that the evidence shows that the mortgagor, Mollie Dorfman, through her agent, Etta Chitra, bought the mortgage and note from the West Side Trust & Savings Bank for $8,250. That Chitra paid the money to the bank, received the trust deed and

note and on the same day delivered them to Mollie. That Mollie, still being the owner of the premises, the lien of that trust deed was discharged and that the evidence further shows that the claim of Meyers as to how he became the owner of the note and trust deed was a sham and a fraud. We think this contention must be sustained.

Counsel for Meyers contends that the "Credibility of witnesses is a question for the master and the court to consider and pass upon and the findings of the master when approved by the court have the same binding force upon Appellate court as a jury verdict in law cases." We think this is a correct statement of the law and it has also been held by our Supreme court that where the master's findings have been approved by the chancellor we are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. *Pasedach v. Auw*, 364 Ill. 491; *Phillips v. W. G. N. Inc.*, 307 Ill. App. 1. And continuing counsel for plaintiff says: "The theory behind this rule is axiomatic in this State. The Trial Court heard and saw the witnesses and can better evaluate their testimony," etc. But while the law is correctly stated by counsel it is not applicable to the facts in the case before us. The master did not hear and see all the witnesses. The two principal witnesses, plaintiff Meyers, and defendant Mollie Dorfman, who were called as adverse witnesses, testified before a notary public and by agreement the evidence was submitted to the master. He did not see these two witnesses and is in no better position to judge the truth of their testimony than are we.

Meyers' testified that he was in the real estate business and also was a security buyer; that he did not know Mollie Dorfman, had never see her and had not talked to her on the telephone; that he was the owner of the trust deed and note for $11,000; that "The note has been reduced to $8,250 and extended." That he

had the extension agreement; that he purchased them in September, 1940; "the only thing I can tell you from whom I acquired the documents, is that my business is buying and selling bonds, real estate securities, and there was some fellow who come in, (I think it was some curbstone bond salesman) and he had a bunch of defaulted mortgages and we worked out some kind of a trade. I had some defaulted mortgages too.

"I did not know the name of the person from whom I acquired the mortgage and note. I might be able to find out. We made a trade and there was some cash involved too. I paid in simple currency; he wouldn't accept any checks; he wouldn't trust anyone. of course, we have records when we buy and sell for straight cash, but when it works out as a trade, I don't know just how it is handled. We keep no records when it is a trade. . . . I gave certain defaulted bonds for this mortgage and note; I don't remember what they were. I doubt seriously whether my office would have any records of this transaction." He further testified that he did not remember at the time he purchased the mortgage and note whether he investigated the condition of the buildings himself or whether "I just took his word for it. . . . My office file would not disclose any information regarding it. . . . I don't remember whether I got a mortgage policy with the trust deed and notes. . . . I did not receive fire insurance policies with the papers I purchased. I don't remember whether I knew at the time I purchased the mortgage and note that the improvements on the premises had been burned to the ground, but I knew it subsequently. . . . I did not investigate, nor did anyone in my office investigate the financial responsibility of the makers of the trust deed and note before I made the purchase."

Mollie Dorfman, the defendant, called as an adverse witness on behalf of her brother, Sam, testified before a notary public that she had been in business but had

to give it up. She "couldn't make it go." That she did not know the plaintiff, Meyers,—never heard of him. That she did not pay the $11,000 mortgage on the property but Etta Chitra, who was a friend of hers, did. That Etta bought the mortgage for $8,250 and later "she gave it to me because I said I am going to get money from a lady friend. . . . I gave the mortgage to a lady friend. In the beginning I paid Etta Chitra off little by little." That she could not remember the total amount she paid. She was then asked the name of the woman to whom she gave the note and trust deed and she asked: "Do I have to tell you what woman"? Her attorney then instructed her not to give the name. She further testified that she paid the unnamed woman little by little the loan the woman had made to her. She could not tell exactly how much she had paid. That she did not remember when she turned over the mortgage and note to this unnamed woman. That Etta Chitra got the note and trust deed from the bank and gave it to the witness. That Etta Chitra told her she wanted her money because she was going to buy a building "but I didn't have the money. So I went out and borrowed it from this other woman," and gave it to Etta Chitra. That Etta Chitra did not give the witness the note and trust deed the day she bought it from the receiver of the bank but maybe two or three weeks afterwards. That she partially repaid the unnamed woman who loaned her the money; "and she told me she is going to sell the mortgage, needs money and I was trying she should keep the mortgage alive." The woman said she was going to sell the mortgage and I said, " 'Go ahead and do it.' I gave her once $500, and I gave her once $200. I think I got receipts. I paid her cash. I didn't have any checks. . . . It is not the truth that I received approximately $16,000, as the assured on certain fire insurance policies covered by the mortgage." That the unnamed woman sold the mort-

gage for $2800 or $2700. That the witness still owed her some more money on the mortgage. "I don't know how much." That the witness still owned the property on which she and her husband gave the mortgage. Before the evidence heard by the master was closed it was stipulated that the unnamed woman, above mentioned, was Esther L. Miller. She was not called as a witness. Etta Chitra, called by defendant Nerenberg, before the master, testified that she had known Mrs. Dorfman for 25 years; was not related to her and they "used to be good friends." That on December 30, 1935, she bought the mortgage and note for $8,250 from the receiver of the bank. That she paid by check, "I bought it for Mollie Dorfman." And on the same day she went to Mrs. Dorfman's home and gave her the mortgage papers. "I say, 'Mollie, here is the paper which you are struggling for.'" That the note and trust deed "were paid for by money given by Mollie Dorfman and by money I borrowed. She paid back the money I loaned her up to the penny. . . . Mollie Dorfman and I are the best of friends. . . . She is one of the finest persons in the world. . . . The day I went to get the mortgage, Mollie Dorfman gave me the money in cash. I bought a check at the Liberty Bank. . . . I paid $1.40 for it," and gave the check to the receiver and he gave her the mortgage. On cross-examination she testified that Mr. Slan, Mrs. Dorfman's lawyer, who apparently was at the bank, read the mortgage to her. That she did not know plaintiff Meyers, had never seen him. That in paying the mortgage she used $1,800 of her own money, borrowed $500 from Dr. Brodie, $300 from her mother-in-law and $500 from her friend, Mrs. Alec.

On re-direct she testified that Mr. Slan, Mollie's lawyer, was at the bank the day before she bought the mortgage. "I was short some money that day. I came the next morning myself and I said, 'here is the

rest of the money,' then the receiver gave it to me.'' That she had known Mollie Dorfman and her brother, Sam Nerenberg, since they came to the United States.

It was then stipulated by the parties that if plaintiff, Meyers, were present he would testify that he was the owner and holder of the note and trust deed and the extension agreement on which there was a balance due of $10,500. That there was a default in the payment of taxes for the years 1931, 1938, 1939, 1940 and 1941 which totalled about $1,200 or $1,300. It was further stipulated that Sam Nerenberg was the owner and holder of the other trust deed and extension agreement, and that if plaintiff, Meyers, were cross-examined he would make the same answers as he made in the deposition taken January 31, 1941 and that "J. Meyers would testify that the sum of $3,250 is the amount which is allocated to the cost of the mortgage and note; that the mortgage and note were acquired in exchange of first mortgage gold bonds. In addition to the exchange, some cash was paid.''

Counsel for plaintiff says that four objections on behalf of Nerenberg were made to the master's report, the first three of which were sustained and the fourth overruled. And he says that the substance of the fourth objection was "that the acquisition of the first mortgage and note by Mollie Dorfman, merged this lien into the legal title.''

Counsel for Nerenberg says that "Plaintiff's testimony as to the manner and circumstances surrounding plaintiff's claimed purchase of the note and trust deed raises a presumption against the acceptance of his testimony, and requires that on this issue his testimony be disregarded in its entirety.'' And that Mollie Dorfman's testimony considered in the light of plaintiff's testimony "clearly indicates that a conspiracy existed between plaintiff and Mollie Dorfman.''

The fourth objection to the master's report was that the master erred in concluding that there was no merit

in the objection for the reason that Mollie Dorfman at all times manifested clearly an intention to keep the lien of the trust deed alive. We think it obvious that whether the master was right or wrong must be determined from a consideration of all the evidence. We hold the objection was sufficient.

We have above detailed at considerable length the testimony of two witnesses, Meyers and Mollie Dorfman, and think little credence should be given to what they said. Meyers claims to have purchased the note and trust deed from some curbstone bond salesman whose name he could not remember; it was in default—many years overdue and taxes were unpaid for years. Esther L. Miller, the unnamed woman, was not called as a witness. The buildings on the property had been totally destroyed by fire and the evidence shows that Mollie Dorfman, although she denied receiving the insurance, was paid $16,250 for the loss caused by the fire. As above stated, the master did not see or hear these two witnesses testify and of course the chancellor saw and heard none of them. In these circumstances we think that Sam Nerenberg should be given a first lien on the property.

The decree of the Superior court of Cook county is reversed and the cause remanded with directions to give Sam Nerenberg a first mortgage lien on the property.

*Reversed and remanded with directions.*

NIEMEYER and MATCHETT, JJ., concur.