[Civ. No. 32615. Second Dist., Div. Five. June 5, 1969.]

B. J. WILLIAMS, Plaintiff and Respondent, v. J. EDWIN
WEISSER, Defendant and Appellant.

Robert Louis Finkel for Defendant and Appellant.

Amil Roth for Plaintiff and Respondent.

Thomas J. Cunningham and James E. Holst as Amici Curiae on behalf of Plaintiff and Respondent.

KAUS, P. J.—Defendant Weisser, who does business under the fictitious name of Class Notes, appeals from a judgment which enjoins him from copying, publishing and selling notes of lectures delivered by plaintiff in his capacity as an Assistant Professor of Anthropology at the University of California at Los Angeles ("UCLA"). The judgment also awards plaintiff $1,000 in compensatory and $500 in exemplary damages.

A joint pretrial statement described the nature of the case as follows: "Plaintiff is Assistant Professor at UCLA in the Anthropology Department. Defendant does business in Westwood, California as Class Notes selling outlines for various courses given at UCLA. In 1965, defendant paid Karen Allen, a UCLA student, to attend plaintiff's class in Anthropology 1 to take notes from the lectures, and to type up the notes. Allen delivered the typed notes to defendant and defendant placed a copyright notice thereon in defendant's name, reproduced the typed notes, and sold and offered them for sale. Plaintiff objected. Defendant did not cease these activities

until served with summons, complaint and temporary restraining order. Plaintiff seeks a permanent injunction, general damages, and punitive damages.''

At the pretrial it was agreed that: ''Defendant has used plaintiff's name in selling the publications here in question.''

The judgment in plaintiff's favor was based on two grounds: 1. defendant infringed plaintiff's common law copyright in his lectures; and 2, defendant invaded plaintiff's privacy by the use of plaintiff's name. (*Fairfield v. American Photocopy etc. Co.*, 138 Cal.App.2d 82 [291 P.2d 194].)

On appeal defendant advances the following points:

1. The common law copyright in plaintiff's lectures presumptively belonged to UCLA. Defendant's efforts at the trial to show that a purported assignment of the rights of the university to plaintiff was not intended to be an assignment or, if it was, that it was made under a mistake of law, were erroneously cut off by a peremptory ruling that plaintiff was the owner of the copyright.

2. Even if plaintiff was the owner of the copyright the ''general and unrestricted publication'' of the ''organization and content'' of the lectures constituted a divestment of any such right.

3. Defendant's use of the notes was ''a fair use and did not constitute a wrongful trading on, or actionable commercial abuse of, plaintiff's personality or reputation.''

4. The evidence does not support the award of damages, compensatory or exemplary.

Certain preliminary observations are in order:

1. The product of the mind in which the plaintiff claims a copyright consists of the extensive notes which he had compiled before the beginning of the course, together with the oral expression at the time of delivery of the lectures, based on the notes, which delivery included charts and diagrams placed on the classroom blackboard. This is, therefore, not a case where the concrete expression of the ''composition'' (Civ. Code, § 980, subd. (a)) consists solely of an intangible oral presentation. (Nimmer on Copyright § 11.1.) As far as this litigation is concerned, the chief importance of the oral presentation is that it provided defendant with access to plaintiff's work and with an argument that there had been a divestive publication.

2. Defendant does not dispute on this appeal that the lectures were properly the subject of a common law copyright. Below it was contended that they lacked originality, were

"merely lightly embellished and thinly disguised paraphrasings of the works of others, both as to form and content" and were "wholly in the public domain." These contentions are now abandoned.

3. Substantial similarity between the lectures and the notes published by defendant is conceded.

### OWNERSHIP OF COPYRIGHT

Plaintiff became employed by UCLA starting in July 1965. Defendant's relations with the university started in 1948 when he began to publish and sell to students what purported to be notes of various courses. In 1963 defendant and the university authorities agreed on certain ground rules as a condition to advertising in the Daily Bruin, the student newspaper. Friction arose between defendant and the administration. The matter culminated in a memorandum dated November 19, 1964, addressed to all members of the faculty. It is copied in the footnote.[1]

At the trial Vice Chancellor Sherwood of UCLA appeared as one of plaintiff's witnesses. He testified, among other matters, to the following: He had served for eight years as a member of the faculty committee charged with the responsibility of approving manuscripts for publication by the University of California Press. If a, professor's manuscript was thought to have commercial value, the university would sign a

---

[1] "MEMBERS OF THE FACULTY: As many of you know there is now a business firm operating in Westwood Village offering for sale lecture notes on current UCLA courses. This company, CLASS LECTURE NOTES, publishes notes taken by its agents who attend classes either as auditors or, occasionally, as enrolled students. The notes are marketed to students who, for a variety of reasons, believe they need an additional study aid.

"Many instructors object to this procedure. Others apparently do not. We believe, however, that all should be aware of the instructor's rights regarding use of notes taken on his lectures.

"First, regarding the attendance of auditors, whatever their purposes may be (except for Summer Session) it is the policy of the University to defer entirely to the wishes of the individual faculty member. Any faculty member has the right to deny the attendance of auditors if he so desires.

"Secondly, regarding the faculty member's right to control distribution of notes taken in classroom lecture, it appears quite clear that under California's recognition of common law copyright, the lecturer retains a property right to his words spoken before a limited audience. Any unauthorized duplication and distribution of these words, either verbatim or in the form of notes may therefore constitute an infringement of this right. It is emphasized that the common law copyright in a lecture is the property of the lecturer rather than of the University, and therefore any legal actions for the infringement of such right must be brought in the name of the aggrieved faculty member.

"Charles E. Young
Vice Chancellor"

regular publisher's contract with the author, under which contract the professor would receive royalties at commercial rates. This was, to his knowledge, the practice throughout the United States.[2]

In 1964 Vice Chancellor Sherwood and Vice Chancellor Young drafted the memorandum of November 19, 1964. This was done after a discussion with Mr. John Sparrow, counsel representing the university. The court's peremptory ruling to the effect that plaintiff, rather than the university, was the owner of the copyright came right after Sherwood, on cross-examination, had perhaps admitted that if it were the law of California that the copyright in a professor's lectures belongs to the university that might have somehow affected the November 19, 1964, memorandum.[3] He did, however, point out that if such were the law, it would simplify his job immensely, since "a faculty member would not be able to leave the university for the university would have a right to his lectures and he could only go to another institution if he were in a position to turn his attention to a new subject."[4]

During the argument that followed the ruling, counsel, although he perhaps was not required to do so (*Tossman* v. *Newman*, 37 Cal.2d 522, 525-526 [233 P.2d 1]; *Lawless* v. *Calaway*, 24 Cal.2d 81, 90-91 [147 P.2d 604]; *Caminetti* v. *Pacific Mut. Life Ins. Co.*, 23 Cal.2d 94, 100 [142 P.2d 741]; *People* v. *Jones*, 160 Cal. 358, 363 [117 P. 176]; Evid. Code, § 354, subd. (c)), stated: ". . . I believe he would testify, and I offer by way of offer of proof, that this witness will further testify if allowed to do so that this letter was nothing

---

[2]Even at the University of Chicago where, since the days of President Hutchins, a policy of so-called "strict full time employment" had been followed, such policy did not extend to royalties from books.

[3]Just what the witness admitted is somewhat in doubt. The question and answer read as follows: "Q Now, whether you like it or not personally, regardless of your feelings viscerally about it if the law of California had been or were to the effect that—you have been in the courtroom and you have heard my colloquys [*sic*] with the Court, that the employer owns the literary property produced by the employee within the scope of his employment and, therefore, the professor's literary property in the lectures belongs to the university—now, if such were the law in California that would in effect be the interpretation of the last paragraph of this letter, would it not? A. Yes, if that were so."

[4]We do not intimate that the result of the university's ownership of a common law copyright to the lectures of a professor would be so drastic. There is a clear distinction between what is taught and how it is taught. (See *Baker* v. *Selden*, 101 U.S. 99 [25 L.Ed. 841].) What is at stake here is not any ownership in the subject matter of Anthropology 1 but the concrete form in which plaintiff has cast the subject for pedagogical purposes

more than a statement of his and Chancellor Young's understanding of the California common-law.''

After this offer of proof the court asked a few questions of the witness: ''. . . I will just ask one more question on this subject, Dr. Sherwood. Whether it was rightly or wrongly the expression of the opinion of counsel, is this the policy that was followed by the university with respect to these lecture notes? THE WITNESS: It is. THE COURT: And that is what you intended? THE WITNESS: And that is what we intended.''

If it were the law that, in the absence of evidence one way or another, UCLA rather than plaintiff is presumed to be the owner of the copyright to plaintiff's lectures or if the record contained any evidence that plaintiff had assigned his copyright to the university, the trial court's ruling would have been premature. For what it was worth, defendant was still developing his theory that the November 19 memorandum did not effectively transfer the university's copyright to plaintiff.

█ We are, however, convinced that in the absence of evidence the teacher, rather than the university, owns the common law copyright to his lectures. Since there was no evidence that plaintiff had assigned his copyright to the university, the entire question of whether the university had quitclaimed something it did not own was beside the point. Defendant was therefore not prejudiced by the ruling.[5]

█ Defendant claims that the opposite is the law. His sole statutory authority is section 2860 of the Labor Code which reads as follows: ''Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.''

It is obvious that a literal application of that section does not cover the present situation. The code speaks of things which the employee ''acquires,'' not matters which he creates. In *Burns* v. *Clark*, 133 Cal. 634, 639 [66 P. 12, 85 Am.St. Rep. 233], the Supreme Court said that the section, then section 1985 of the Civil Code, was to be construed as ''but an expression of the familiar principle that forbids an agent or trustee from using the trust property or powers conferred

---

[5]It seems that all defendant's theory amounted to is that the university had an equitable right to rescind its November 19, 1964, grant on the basis of a mistake of law. It should be noted that if UCLA has such an equity, it is perfectly content to sleep on it. Counsel for the University of California has filed a very helpful amicus curiae brief urging affirmance.

upon him for his own benefit, and which, in case of his doing so, requires him to account for the profits." (See also *Southern Cal. Disinfecting Co.* v. *Lomkin*, 183 Cal.App.2d 431, 444 [7 Cal.Rptr. 43].) Thus the section has been applied principally, though not exclusively, to unfair competition carried on by former employees with the use of trade secrets and the like. Even so it has been narrowly employed. (*Aetna Bldg. Maintenance Co.* v. *West*, 39 Cal.2d 198, 204 [246 P.2d 11].) We do not believe it applies here.

 Defendant also claims that plaintiff is in the position of an employee for hire whose employment calls for the creation of a copyrightable work or, perhaps, of an independent contractor who has been so commissioned. (Nimmer on Copyright §§ 62, 63.) In such cases it is usually presumed that, unless a different intention is shown, the employer or commissioner is the owner of the copyright. (*Zahler* v. *Columbia Pictures Corp.*, 180 Cal.App.2d 582, 589-590 [4 Cal.Rptr. 612].)

This contention calls for some understanding of the purpose for which a university hires a professor and what rights it may reasonably expect to retain after the services have been rendered. A university's obligation to its students is to make the subject matter covered by a course available for study by various methods, including classroom presentation. It is not obligated to present the subject by means of any particular expression. As far as the teacher is concerned, neither the record in this case nor any custom known to us suggests that the university can prescribe his way of expressing the ideas he puts before his students. Yet expression is what this lawsuit is all about. No reason has been suggested why a university would want to retain the ownership in a professor's expression. Such retention would be useless except possibly for making a little profit from a publication and for making it difficult for the teacher to give the same lectures, should he change jobs.

Indeed the undesirable consequences which would follow from a holding that a university owns the copyright to the lectures of its professors are such as to compel a holding that it does not. Professors are a peripatetic lot, moving from campus to campus. The courses they teach begin to take shape at one institution and are developed and embellished at another. That, as a matter of fact, was the case here. Plaintiff testified that the notes on which his lectures were based were derived from a similar course which he had given at another univer-

sity. If defendant is correct, there must be some rights of that school which were infringed at UCLA. Further, should plaintiff leave UCLA and give a substantially similar course at his next post, UCLA would be able to enjoin him from using the material which, according to defendant, it owns.

No one but defendant, an outsider as far as the relationship between plaintiff and UCLA is concerned, suggests that such a state of the law is desirable.[6]

Another strange consequence which would follow from equating university lectures with other products of the mind which an employee is hired to create, is, that in order to determine just what it is getting, the university would have to find out the precise extent to which a professor's lectures have taken concrete shape when he first comes to work. Not even defendant suggests that a contract for employment implies an assignment to the university of any common law copyright which the professor already owns.

█ The many cases cited by defendant for the general rule probably reach desirable results that are in accord with common understanding in their respective areas, but a rule of law developed in one context should not be blindly applied in another where it violates the intention of the parties and creates undesireable consequences. █ University lectures are *sui generis*. Absent compulsion by statute or precedent, they should not be blindly thrown into the same legal hopper with valve designs (*Daniel Orifice Fitting Co.* v. *Whalen,* 198 Cal.App.2d 791 [18 Cal.Rptr. 659]), motion picture background music (*Zahler* v. *Columbia Pictures Corp., supra*), commercial drawings (*Linbrook Builders Hardware* v. *Gertler,* 352 F.2d 298), mosaics designed for the Congressional Library in Washington, D.C. (*Dielman* v. *White,* 102 F. 892), high school murals (*Yardley* v. *Houghton Mifflin Co.,* 25 F.Supp. 361), song stylings (*Nelson* v. *Radio Corp. of America,* 148 F.Supp. 1), radio scripts (*Phillips* v. *WGN, Inc.,* 307 Ill.App. 1 [29 N.E.2d 849]; *Storer Broadcasting Co.* v. *Jack The Bellboy, Inc.,* 107 F.Supp. 988), commercial jingles (*Brown* v. *Molle Co.,* 20 F.Supp. 135), lists of courses taught by a correspondence school (*Colliery Engineer Co.* v. *United Correspondence Schools Co.,* 94 F. 152), and treatises on the

---

[6]In fairness it should be noted that Lord FitzGerald's dissent in *Caird* v. *Sime* [1887] 12 A.C. 326, 354 (H. L.) contains the following passage: "Again, it was urged that the professional practice of repeating the same lecture session after session, in like manner as a minister repeats his sermon, would be interfered with. If this was so, it would seem to be a desireable result."

use of ozone (*United States Ozone Co.* v. *United States Ozone Co.,* 62 F.2d 881) or on larceny and homicide (*Edward Thompson Co.* v. *Clark,* 109 N.Y.S. 700).

On the other hand, there is a short but sturdy line of authorities dealing with lectures. Though none of the cases have as their protagonists the teacher opposed by the institution, the latter's position is at least tangentially discussed in some. The fact that none of the defendants—pirates all—ever thought that the question of the institution's rights, as such, was worth raising is surely not without significance.

The first and leading case is *Abernethy* v. *Hutchinson,* 3 L.J. (Ch.) 209 (1825), 1 H. & T. 28 (1825). If in point it is controlling authority. (Civ. Code, § 22.2) ; *Cole* v. *Rush,* 45 Cal.2d 345, 355-356 [289 P.2d 450, 54 A.L.R.2d 1137].)

Doctor Abernethy was a surgeon who had delivered lectures on surgery to students and others at Saint Bartholomews Hospital in London. His lectures were based on notes, but he did not read from or refer to them during the lectures. Defendant had published Abernethy's lectures in its periodical "The Lancet." After much soul-searching Lord Eldon granted an injunction. Near the end of his opinion he states: "One question had been, whether Mr. Abernethy, from the peculiar situation which he filled in the hospital, was precluded from publishing his own lectures for his profit; *but there was no evidence before the Court, that he had not such right.* Therefore the defendants must be enjoined in future." (3 L.J. at p. 219. Italics added.) Earlier in the opinion the court had likened Doctor Abernethy's position to that of a university professor.[7] From our point of view, the significance of the quoted passage is that in the absence of positive evidence to the contrary the Chancellor assumed as a matter of course that the copyright was with the lecturer and not with the hospital. *A fortiori* it would not belong to a university.

---

[7] One of the reasons why Lord Eldon assumed that professors have a common law copyright in their lectures was the historical fact that Blackstone had published the Vinerian Lectures under copyright: "Now, if a professor be appointed, he is appointed for the purpose of giving information to all the students who attend him, and it is his duty to do that; but I have never yet heard that anybody could publish his lectures; nor can I conceive on what ground Sir William Blackstone had the copyright in his lectures for twenty years, if there had been such a right as that; we used to take notes at his lectures; at Sir Robert Chamber's lectures also the students used to take notes; but it never was understood that those lectures could be published;—and so with respect to any other lectures in the university, it was the duty of certain persons to give those lectures but it never was understood, that the lectures were capable of being published by any of the persons who heard them." (3 L.J. at p. 215.)

The case which is factually closest in point is *Caird* v. *Sime* [1887] 12 A.C. 326 (H.L.). There the House of Lords had before it a case coming from Scotland. There is, however, no suggestion that Scottish law differed from that of England in respect to the issues involved. Caird, the ''pursuer,'' was a professor of moral philosophy at the University of Glasgow. Sime, the ''defender,'' had published pamphlets of lectures given by Caird. The pamphlets were based on shorthand notes taken by one of Caird's students. There was a substantial question whether Sime's pamphlets were in fact reproductions of Caird's lectures. It was contended that in certain particulars they were ''blundering and unsuccessful'' copies of the lectures ''with ignorant or foolish additions.'' This, the court said, did not matter. In law the case turned on the question whether Caird had lost his common law copyright because as a professor in a public university it was his obligation ''to receive into his class all comers having the requisite qualification.'' Therefore, it was argued, ''his lectures are really addressed to the public.'' In answer to this point the court noted that it was a ''fact that professors and their representatives have been in frequent use to publish lectures which had been annually delivered for years before such publication, and have enjoyed, without objection or challenge, the privilege of copyright.'' Sime's point did not prevail.

While at this point in our discussion we are not concerned with any possible divestment of plaintiff's copyright by the giving of his lectures, we think it is of some significance to the question of his ownership of the copyright vis-a-vis the university, that Caird's position as a professor at a public university was used as an argument in *Caird* v. *Sime* and found not to be an obstacle to recovery.

*Caird* v. *Sime* is also significant in that it lays to rest an argument made by defendant in this court, namely that *Abernethy* v. *Hutchinson, supra,* had been overruled. The House of Lords took note of the fact that its records showed that within a few months after the injunction in that case was issued, it was dissolved on motion by the defendants; however ''no trace had been found of the affidavit on which the motion was made, so that the recall of the injunction may have been the result of an arrangement between the parties, and at all events it cannot detract from the weight of Lord Elton's deliberate judgment causa cognita.''

The plaintiff in *Nicols* v. *Pitman,* 26 Ch. Div. 374 (1884) had composed a lecture entitled ''The Dog as the Friend of

Man," which he delivered at a working men's college. Defendant attended the lecture, wrote it down in shorthand and published it in his publication "The Phonographic Lecturer." Relying chiefly on *Abernethy* v. *Hutchinson, supra,* a perpetual injunction was granted.

Crossing the Atlantic we find *Sherrill* v. *Grieves,* 57 Wash. L.R. 286, 20 C.O. Bull. 675, decided by the Supreme Court of the District of Columbia in 1929. Sherrill was an instructor at the postgraduate school for officers of the United States Army at Fort Leavenworth. He found that no suitable text existed on military sketching, map reading and surveying. During his leisure time, not as an incident to his work as instructor, he prepared material for and worked on a book designed to fill the gap. Before the book was actually published he permitted the authorities at Leavenworth to print a pamphlet containing the part relating to military sketching. Sherrill obtained a statutory copyright on the pamphlet. It was claimed by the defendants, who had published an infringing work, that they could freely do so because Sherrill's pamphlet was a "publication of the United States Government." (17 U.S.C. § 8.) Discussing that claim the court said: "The evidence shows that the authorities at Leavenworth responsible for the printing asked permission to print the pamphlet for a limited use because it was thought that to do so would facilitate the giving of instruction to the students. Counsel for defendant say that it may be conceded arguendo that it was no part of plaintiff's duty to print the instructions in military sketching, either at his own or at Government expense, but that it was his legal contract duty to the Government to give to the student officer the identical instruction contained in the pamphlet if that was the best treatment of the subject of which he was capable, and that when he adopted as a means of performing his duty written instructions and had them printed at Government expense in a Government printery the court must assume that he had the consent of the superior officers at the school to discharge his duty in that way. But the evidence shows that the plaintiff did not have the pamphlet printed; it was his superior officer who did so. The plaintiff at the time was employed to give instruction just as a professor in an institution of learning is employed. *The court does not know of any authority holding that such a professor is obliged to reduce his lectures to writing or if he does so that they become the property of the institution employing him. . . .* The fact is that officers do write such books which are copyrighted and

used in Government schools with the approval of the military establishment, and such books are found in the libraries of those establishments. See *Callaghan* v. *Myers*, 128 U.S. 617, which interprets *Wheaton* v. *Peters*, 8 Peters 591, as holding that even though a reporter of the Supreme Court of the United States is paid by the Government a salary for such reports, he may have copyright in his original notes and other original matter in the reports." (*Sherrill* v. *Grieves*, 20 C.O. Bull. 675, 687-688. Italics added.)

There is, of course, a possible distinction between *Sherrill* v. *Grieves* and the case at bar: the report does state that the material was prepared in Sherrill's "leisure time, not as an incident to his work as instructor."

The distinction is illusory. If the employing institution has any rights at all, they stem from the fact that the teacher, when preparing his lectures, is only doing that which he is hired to do. Since it is not customary for a college to prescribe the hours of the day when a teacher is to prepare for class, it follows that the time when he does so automatically ceases to be leisure time.

In any event, it is quite arguable that plaintiff prepared his notes in his "leisure time" if that concept has any validity. The evidence below showed that he signed his contract with UCLA early in 1965, was put on a salary in July of that year and started to teach in September. Before arriving at UCLA he had accumulated notes over a period of years. He prepared the notes from which he eventually delivered his lectures during the summer.

There is therefore no real difference between Sherrill and plaintiff. Neither was under a duty to make notes, neither was under a duty to prepare for his lectures during any fixed hours, but the notes that each made did directly relate to the subjects taught.

The parties make much over the protracted *Rickover* litigation. In *Public Affairs Associates, Inc.* v. *Rickover*, 177 F.Supp. 601, 604, the trial court held that Admiral Rickover could legally copyright speeches "that have some bearing on, or that arise out of his official actions, although writing the book or delivering the address in question, is no part of his official duties." The speeches in question were prepared by the Admiral after normal working hours or while traveling. The court held that such works, which fall somewhere between copyrightable products which an employee is hired to write and writings which have no connection whatever with his offi-

cial activities, did not constitute publications of the United States government. (17 U.S.C. § 8.) It also held that the delivery of the speeches and the distribution of a limited number of copies was not an abandonment of the literary property or a dedication to the public. On this latter point the trial court was reversed in *Public Affairs Associates, Inc.* v. *Rickover*, 284 F.2d 262 [109 App. D.C. 128]. The Court of Appeals agreed that the speeches were not government publications, but held that because of the wide distribution of the speeches to the press and others, there had been a divestive publication before Admiral Rickover had registered his claim to copyright in 22 of the speeches involved. With respect to the balance of the speeches the court remanded the case to the district court for further evidence. The Supreme Court granted certiorari, but later vacated the judgment of the Court of Appeal for lack of a sufficient record. (369 U.S. 111 [7 L.Ed.2d 604, 82 S.Ct. 580].) The matter was eventually retried (*Public Affairs Associates, Inc.* v. *Rickover*, 268 F.Supp. 444), but only with respect to two speeches given after the Admiral had obtained a statutory copyright. He again prevailed.

To whatever extent the *Rickover* cases are in point and persuasive, they do not hurt plaintiff's case. Mention of the fact that the Admiral prepared his speeches after normal working hours or while traveling has already been shown to be beside the point. A person in Admiral Rickover's position—"Assistant Director for Naval Reactors, Division of Reactor Development, Atomic Energy Commission, and Assistant Chief of the Bureau of Ships for Nuclear Propulsion, United States Navy"—has no normal working hours any more than a university professor. Whatever distinctions between "on" and "off-duty" hours might be appropriate in the case of an hourly employee who punches a clock, they are quite out of place in cases such as *Rickover* and the one at bar. (See *Aero Bold & Screw Co.* v. *Iaia*, 180 Cal.App.2d 728, 736-737 [5 Cal.Rptr. 53].)

It is thus apparent that no authority supports the argument that the copyright to plaintiff's notes is in the university. The indications from the authorities are the other way and so is common sense.

DIVESTIVE PUBLICATION

Little needs to be said on the point of divestive publication. The question of what manner of publication divests a common law copyright to a lecture is extensively discussed in

D. E. Harding, *Copyright in Lectures, Sermons, and Speeches* (1966) 14 Ascap, Copyright Law Symposium 270, 291-324. The author there points out that the authorities approach the problem in two ways. Professor Nimmer's view is that no divestive publication occurs unless there is a distribution of tangible copies of the work. (Nimmer on Copyright, §§ 49, 52; Nimmer, *Copyright Publications*, 56 Colum.L.Rev. 184, 197.) In other words the doctrine of *Ferris* v. *Frohman*, 223 U.S. 424 [56 L.Ed. 492, 32 S.Ct. 263], that performance does not dedicate, applies. Other authorities make the distinction between "limited" and "general" publication. (*Nutt* v. *National Institute Inc. for the Imp. of Memory*, 31 F.2d 236, 238; *Werckmeister* v. *American Lithographic Co.*, 134 F. 321, 324-325; Nimmer on Copyright, § 58.) Under either view the oral delivery of the lectures did not divest plaintiff of his common law copyright to his lectures. Nothing tangible was delivered to the students and every case that has considered the problem of divestment from the limited versus general publication point of view has reached the conclusion that the giving of a lecture is not a general publication. (*Abernethy* v. *Hutchinson, supra*; *Caird* v. *Sime, supra*; *Nicols* v. *Pitman, supra*; *Bartlette* v. *Crittenden*, 2 F.Cas. 981 (No. 1,082); *Nutt* v. *National Institute Inc. for the Imp. of Memory, supra*; *Sherrill* v. *Grieves, supra*.) As the court said in *Caird* v. *Sime*, holding that the publication of the plaintiff's lecture was only limited: ". . . The principle which pervades the whole of that reasoning is, that where the persons present at a lecture are not the general public, but a limited class of the public, selected and admitted for the sole and special purpose of receiving individual instruction, they may make any use they can of the lecture, to the extent of taking it down in shorthand, for their own information and improvement, but cannot publish it. . . ." (12 A.C. at pp. 347-348.)

### PRIVACY

 Although defendant speaks of "fair use," the context of his argument shows that he is not relying on the defense of fair use as known in the law of copyright. (Nimmer on Copyright, § 145.) Rather he claims a defense to the alternative basis on which the court found in plaintiff's favor, that is to say, invasion of privacy.

Liability on that theory was predicated on defendant's use of plaintiff's name in connection with the publication, distribution and sale of the notes. It is defendant's position that,

copyright aside, he was privileged to publish the notes and to use plaintiff's name in connection with such publication because "[p]laintiff intentionally placed himself in the public eye when he undertook his employment as an instructor. . . ." In other words defendant seeks to apply the doctrine of such cases as *Werner* v. *Times-Mirror Co.*, 193 Cal.App.2d 111 [14 Cal.Rptr. 208]; *Smith* v. *National Broadcasting Co.*, 138 Cal.App.2d 807, 812 [292 P.2d 600]; *Cohen* v. *Marx*, 94 Cal.App.2d 704 [211 P.2d 320]. and *Metter* v. *Los Angeles Examiner*, 35 Cal.App.2d 304, 312 [95 P.2d 491].

Leaving aside the extent to which a person thrusts himself upon the public eye by giving a course at UCLA, defendant forgets to mention certain aspects of this particular case which bring it into the field of actionable privacy.

 An author who owns the common law copyright to his work can determine whether he wants to publish it and, if so, under what circumstances. Plaintiff had prepared his notes for a specific purpose—as an outline to lectures to be delivered to a class of students. Though he apparently considered them adequate for that purpose, he did not desire a commercial distribution with which his name was associated. Right or wrong, he felt that his professional standing could be jeopardized. There is evidence that other teachers at UCLA did not object to representatives of Class Notes being in the classroom, indeed some cooperated with defendant in revising the product of the note takers. Plaintiff considered the Anthropology 1 notes sold by defendant as defective in several respects, chiefly because of certain omissions. Any person aware of the cooperation given by other faculty members could reasonably believe that plaintiff had assisted in the final product. We think that these considerations easily bring the case within the ambit of *Fairfield* v. *American Photocopy etc. Co.*, 138 Cal.App.2d 82 [291 P.2d 194]. There the defendant used the plaintiff's name in advertising a certain product. He was said to be one of the many satisfied users of the product. He had been a user, but had returned the product to the defendant. The court held that defendant's conduct was "an unauthorized and unwarranted appropriation of plaintiff's personality as a lawyer for pecuniary gain and profit." (138 Cal.App.2d at p. 87.) We think that the *Fairfield* case is indistinguishable from the one at bar.

### DAMAGES

 Defendant attacks the modest damages awarded to plaintiff on the ground that the evidence does not support

them. One of plaintiff's witnesses was a publisher of educational materials. He testified that were he to publish the notes in question he would offer the author a 15 percent royalty and an advance somewhere between $3,000 and $5,000 "depending upon how badly [he] wanted it . . . how competitive the situation might be with other publishers." Without further belaboring the question of damages, this testimony alone supports the award of $1,000. ■■■■ The rule that damages cannot be measured by prospective profits from an unestablished business (*Read* v. *Turner,* 239 Cal.App.2d 504, 514 [48 Cal.Rptr. 919]), does not apply to this situation. The business of the publisher who gave the testimony was well established.

### Exemplary Damages

■■■■ The trial court did not award the punitive damages lightly. It filed a long and thoughtful opinion, discussing defendant's conduct in the premises and certain aspects of the evidence which shed light on his motives and good faith. It concluded that defendant acted with malice, as that concept was explained in *Haun* v. *Hyman,* 223 Cal.App.2d 615, 620 [36 Cal.Rptr. 84]. The evidence supports the court's findings and conclusions.

On appeal defendant claims that the trial court was not entitled to disbelieve his evidence to the effect that at all times he relied on the advice of counsel. Without going into detail, defendant's testimony as a whole was not such as to compel belief in claims which, in their nature, plaintiff could not disprove. Furthermore, defendant's asserted belief in the legalities surrounding his operation was somewhat contradictory. On the one hand he claimed that it was his view that the copyright was with the university. On the other, when justifying departures from his agreement with the university, he said he acted in the belief that UCLA had no rights in the premises except administrative pressures with respect to advertising, which it could bring to bear on the Daily Bruin.

Defendant points to the fact that although he registered a statutory copyright in the notes that he published, when requested to do so he always reassigned that copyright to the instructors in question, provided they would not go into direct competition with him. A similar offer was made to plaintiff. This point misses the mark. Plaintiff's complaint is that he did not want any publication, not that defendant was insufficiently generous after he published without plaintiff's consent. ■■■■ A common law copyright is, after all, mainly

a right of first publication. (*Stanley* v. *Columbia Broadcasting System, Inc.*, 35 Cal.2d 653, 661 [221 P.2d 73, 23 A.L.R.2d 216].)

After defendant was advised that plaintiff objected to the note taking in his class his conduct became extremely devious. According to Miss Allen, who was called as a witness by plaintiff, defendant called her and said that if she chose "to go to Doctor Williams' class from then on and take notes that [she] should not let [herself]—well, not reveal [herself] . . .[a]s a note-taker."[8] Although, under gentle leading by defendant's counsel, Miss Allen softened the impact of that statement under cross-examination, the trial court was entitled to accept the first version at face value.

Taking the evidence as a whole, the trial court was amply justified in concluding that defendant was not an innocent layman, caught in the complexities of the law, but a businessman who, for personal profit, was determined to pursue a certain course of action even if it meant riding roughshod over the rights of others.

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied July 1, 1969, and appellant's petition for a hearing by the Supreme Court was denied July 30, 1969.

---

[8] Miss Allen was not a regularly enrolled student in plaintiff's class.