QUESTIONS: 1. Who is the legal owner of the material entitled "K12 Scope and Sequence of Media Skills" and of the instructional kits developed to accompany that material? 2. Is the "legal owner" the only one who can reproduce and market these materials? 3. Could the Leon District Media Specialists' Association gain rights to reproduce and sell some of these materials, assuming that the Leon district school system is the "legal owner" of all of these materials? 4. Could the Media Specialists' Association market and retain all proceeds from sale of a booklet developed explaining these kits and how to construct them (a do-ityourself book for the above program) by media specialists not working on county time?
SUMMARY: The common-law copyright to educational materials produced by teachers in the public school system who were employed to produce such materials, using school facilities and equipment, is owned by the district school board employer in the absence of an agreement under which the teachers retain some right in or with respect to such materials. The right to first publication — which is the only right protected by the common-law copyright — may be lost by general publication or it may be assigned. An assignment of the "copyright" in an unpublished work includes the entire property therein, both common-law and statutory. AS TO QUESTION 1: It should be noted at the outset that the question of the ownership of both productions — the 1970 media-skill program and the 1972 instructional kit — is a mixed question of law and fact which should be determined in an appropriate proceeding in which both sides of the controversy may be heard; and this office — not being a factfinding body — can be of assistance in this situation only by setting out the principles of law applicable to the facts as presented by you. It is hoped that, with these principles in mind, some amicable disposition of the controversy may be made. The materials in question are "intellectual" compositions or productions which are, perhaps, proper subjects for copyrighting under the federal Copyright Act, 17 U.S.C. § 26; and, in any event, they are entitled to the protection of a common-law copyright — that is, the exclusive right of the owner to make first publication and to authorize a limited use of the material subject to such conditions and restrictions as he may impose. [See] 18 C.J.S. Copyright and Literary Property s. 5, p. 139. Accord: 18 Am. Jur.2d Copyright and Literary Property s. 10, noting that, where an intellectual production has been put into tangible form, there appears to be no limitation upon the kind of literary production which will be protected by common-law copyright. Ordinarily, it is the creator or author of a literary or intellectual production who has the exclusive right to the use of the production before publication. Schleman v. Guaranty Title Co., 15 So.2d 754, 760 (Fla. 1943). However, this right may be lost when the creation or production results from and in the course of employment for that purpose, either with or without a formal agreement to that effect. As stated in 18 C.J.S. Copyright and Literary Property s. 11, p. 145: The property in intellectual productions produced by one employed for that purpose, belongs to the employer, and not the employee, even in the absence of an express or formal assignment or contract to that effect. However, the employer will acquire title to only such works of his employee as are contemplated by the contract of employment, and the mere fact that they were produced by one while in the general employment of another does not deprive the author of his property therein nor confer it on the employer. (Emphasis supplied.) Accord: Zahler v. Columbia Pictures Corp., 4 Cal.Rptr. 612,617 (2 D.C.A. Cal., 1960), involving the ownership of musical compositions. The court said: Where an employee creates something as part of his duties under his employment, the thing created is the property of his employer unless, of course, by appropriate agreement, the employee retains some right in or with respect to the product. Nelson v. Radio Corp. of America, D.C., 148 F. Supp. 1. Other cases involving an application of this principle are: Daniel Orifice Fitting Co. v. Whalen, 18 Cal.Rptr. 659 (valve designs); Linbrook Builders Hardware v. Gertler, 352 F.2d 298
(commercial drawings); Dielman v. White, 102 F. 892 (mosaics for the Congressional Library); Yardley v. Houghton Mifflin Co.,25 F. Supp. 361 (high school murals); Nelson v. Radio Corp. of America, 148 F. Supp. 1 (song stylings); Phillips v. WGN, Inc.,29 N.E.2d 849 (Ill.App.) (radio scripts); Storer Broadcasting Co. v. Jack The Bellboy, Inc., 107 F. Supp. 988 (radio scripts); Brown v. Molle Co., 20 F. Supp. 135 (commercial jingles); Collier Engineer Co. v. United Correspondence Schools Co., 94 F. 152 (lists of courses taught by a correspondence school); United States Ozone Co. v. United States Ozone Co., 62 F.2d 881 (treatise on the use of ozone); and Edward Thompson Co. v. Clark, 109 N.Y.S. 700 (treatise on larceny and homicide). See, however, Williams v. Weisser, 78 Cal.Rptr. 542 (Cal.App.2d 1969), ruling that, in the absence of evidence to the contrary, the common-law copyright to a university professor's lectures are in the professor rather than in the university, and that the oral delivery of the lectures did not divest the professor of his common-law copyright. And cf. State Board of Education v. Bourne, 7 So.2d 838 (Fla. 1942), as to a patent secured by a state employee while employed under a general contract of employment as a member of the research staff of the Everglades Experiment Station; and State v. Neal,12 So.2d 590 (Fla. 1943), as to a patent obtained by Dr. Neal while working on a project for the University of Florida Experiment Station. In the Bourne case, the court found that the state board had failed to establish its claim of ownership of the patent; in the Neal case, the claim of the state was sustained. The right of the employer to an employee's invention or discovery in a particular situation is based on the fact that the employee has only produced that which he was employed to invent. U.S. v. Dubelier Condenser Corp., 53 S.Ct. 554 (1932). Similarly, the right of an employer to an employee's literary or other intellectual production must be based on the intention of the parties — express or implied — with respect to the scope of the employment and whether the work at issue was produced within such scope. Phillips v. WGN, Inc., supra; Storer Broadcasting Co. v. Jack The Bellboy, Inc., supra. According to your letter, the instructional kits were prepared in 1972 by media-skill specialists under a direct assignment from and employment by the district school board for this particular purpose. It would appear, therefore, under the rules referred to above — and in the absence of an agreement with the teachers to the contrary — that the district school board would have a prior right to first publication of these instructional kits as owner of the common-law copyright. However, as to the 1970 media-skills program, the facts stated in your letter do not lead so clearly to the same conclusion. The ownership of the 1970 material will depend upon the terms of the employment contract and the nature and extent of the services to be performed thereunder, which must be determined in accordance with the rules applicable in the construction of contracts generally. [See] 56 C.J.S. Master and Servant s. 63, p. 478. (In addition to the facts and circumstances surrounding the execution of the agreement, the parties' subsequent actions may be considered as a means of determining the interpretation that they themselves placed upon the contract. Lalow v. Codomo, 101 So.2d 390 [Fla. 1958]; First Mortg. Corp. of Stuart v. deGive, 177 So.2d 741 [2 D.C.A. Fla., 1965].) It might be noted that, even if the district school board has no legal ownership right to the materials, as against a common-law or statutory copyright held by the teachers or their assignee, it might have a so-called "shop right" to use the materials in question under the rule applicable to the use of patented inventions. See U.S. v. Dubelier Condenser Corp., 289 U.S. 178
(1932), defining the shop right in patent law as follows: . . . where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. [citations] This is an application of equitable principles. (Emphasis supplied.) Nor can it be overlooked in the context of "legal ownership" that the rights of the owner to the materials in question may, at this late date, have been lost by "general publication" of the materials. A common-law copyright entitles the owner to the use of the production before publication which is exclusive against the world. [See] 18 C.J.S. Copyright and Literary Property s. 5, p. 138. However, as stated in Schleman v. Guaranty Title Co., supra, at p. 760: But the common law extends its protection no further than the first publication. When the first publication has been made, the common-law right of exclusive publication terminates and the work falls into the public domain. By publication, it becomes dedicated to the public. Thereafter, the author has no exclusive right to multiply copies of the work to control the issuance of copies by others. Accord: 18 C.J.S. Copyright and Literary Property s. 13, p. 156, noting that, after general publication, any person may publish and use a literary or other intellectual work for his own benefit unless it is protected by copyright under the copyright laws. Merely exhibiting a manuscript to others or making a gift of a copy thereof is not a "publication" sufficient to terminate the common-law rights therein. Id., p. 152. However, whenever the public generally, or an indefinite portion of it, is assured of access to the work without further action on the part of the author, a general publication has taken place. Id., p. 150. AS TO QUESTION 2: This question has been answered by what has been said in the answer to question 1. As noted therein, the "legal owner" has the exclusive right to first publication of the intellectual materials in question under his common-law copyright. Thereafter, unless a statutory copyright has been obtained prior to publication, the production is "in the public domain" so that any person may publish and use the materials for his own benefit. AS TO QUESTION 3: The rights of the legal owner of a common-law copyright to a literary or intellectual production are similar to those with respect to other forms of personal property. His right of control resides in him "only so long as he continues to remain the proprietor of [the] production and is subject to any assignments or other contracts made by him with regard thereto . . . ." [See] 18 C.J.S. Copyright and Literary Property s. 5, p. 139. He may contract for a limited private circulation among such persons as he may designate, subject to such terms and conditions as he may wish to impose, without losing his common-law copyright. Id. Thus, the Leon District Media Specialists' Association could acquire from the owner, by contract or assignment, the common-law right of first publication, the right to make a limited circulation among its members, or the right to apply for a statutory copyright. An assignment or reversion of the "copyright" in an unpublished work includes the entire property therein, both common-law and statutory. Id. s. 12, p. 149. Or, as noted above, the association, along with all other members of the public, would acquire the right to reproduce and sell these materials if a general publication thereof has terminated all common-law rights of the owner and no protection has been obtained, if available, under the copyright statutes (17 U.S.C. § 26). AS TO QUESTION 4: If the "booklet" referred to in this question were to be produced under circumstances which would vest in the district school board the ownership thereof, your question is answered by what has been said before. On the other hand, if the circumstances were such as to vest in the media specialists who produced the booklet the ownership thereof, then the only interest which the district school board could have in an answer to this question would concern a possible infringement of its common-law copyright to the media-skill program and instructional kit produced in 1970 and 1972, respectively — assuming arguendo that the district school board originally had and still retains the exclusive right of first production of these materials. And here, again, the question of whether the sale of the booklet would constitute an infringement of the common-law copyright of the owner of the 1970 and 1972 materials is one that should be decided in an appropriate proceeding in which all relevant facts could be developed and a decision rendered under applicable principles of law. This being so, no definitive response to your fourth question, as stated, may be given.